GERKEN v. PLIMPTON.

(Supreme Court, Appellate Division, First Department. June 7, 1901.)

1. PHYSICIANS AND SURGEONS—MALPRACTICE—NEGLECT OF PATIENT.
    A surgeon employed to attend a patient having a fractured arm, who properly sets and resets it, and states at the latter time that he is going on his vacation, and will be gone ten days or two weeks, and directs the patient to keep the arm in a sling, is liable for malpractice in remaining away five weeks, the arm having slipped in the meantime, and become permanently united at a place causing a permanent injury.

2. SAME—EMPLOYMENT—CONTINUANCE.
    The employment of a physician which will render him liable for neg-lect continues while the sickness lasts for which he is employed, or until the employment is ended by the assent of the parties or his dismissal by the patient.

3. SAME—EXCESSIVE DAMAGES.
    Where the negligence of a surgeon called to attend a fractured arm, caused it to unite at the wrong place, causing a permanent deformity, unless refractured, when there is no certainty of the bones uniting, a judgment for $500 is not excessive.

Appeal from trial term, New York county.

Action by Annie Gerken against Warren O. Plimpton for inju-ries received by the negligence of the defendant while acting as a physician. From a judgment in favor of the plaintiff and an order denying a new trial, defendant appeals. Affirmed.

Argued before McLAUGHLIN, PATTERSON, O'BRIEN, INGRA-HAM, and LAUGHLIN, JJ.

B. Gerson Oppenheim, for appellant.
Frank Herwig, for respondent.

INGRAHAM, J. This action was to recover from the defendant, a physician and surgeon, for the injuries sustained by the plaintiff, caused by the neglect of the defendant. The plaintiff testified that on July 29, 1897, she fractured her left arm, and on the 30th the defendant was called to attend her. He put the arm in splints, and directed plaintiff to carry her arm in a sling. The defendant from that time attended the plaintiff until September 12th, when, upon an examination, he found that the bones had not united; and, after treating them, he again put on the bandage, and told the plaintiff that he was going away on his vacation, and would be · back within ten days or two weeks. He did not, however, return for five weeks, when he again examined the arm, and found that the bones had slipped from their position, overlapped, and in this position formed a union, causing a deformity which is permanent unless the bones are refractured and placed in their proper position, and then allowed to unite. The qualifications of the defendant as a physician and surgeon were conceded, and there is no evidence to show that the case was not, in the first instance, properly treated. All of the physicians called united in saying that the method adopted by the defendant up to the 12th day of September —the day on which he examined the arm prior to his departure on his vacation—was proper; and when he made that examination it

is apparent that the bones had failed to unite, and the case was either a delayed union or a nonunion. The evidence was that in cases of this kind it is not uncommon, for some reason connected with the individual peculiarities of the patient, that the bones fail to unite. In such a case the proper treatment is to rub the ends of the bones together, and restore them to their proper position, and to hold them in that position by splints. If the bones then fail to unite, an incision is made, and the bones are held in position by wires, and thus given time to unite. Now, on the 12th day of September, which was six weeks after the injury, there was no union. The defendant then rubbed the ends of the broken bones together, and replaced them in splints, and did not see the plaintiff again for five weeks. The plaintiff testified that at this time the defendant stated that he was going away for a vacation, and that he would be back again within ten days or two weeks, and in the meantime directed her to keep her arm in the sling. The defendant testified that, prior to his leaving, he told the plaintiff that he was going away on his vacation for two or three weeks, and that, if she desired him to call again, she must send for him. As to which of these versions is true is the crucial point in this case, and that question was left for the jury to determine. That the bones of this plaintiff's arm for some reason have improperly united, and that there is a deformity, is conceded. The question is whether the neglect of the defendant in not giving the arm proper attention caused this deformity. The defendant was called in as a surgeon in connection with a physician who was first summoned, who did not consider himself competent to treat a case of this kind; and as such he undoubtedly undertook the case, and in doing so assumed to give it the care and attention required. If, on this 12th day of September, he told the plaintiff he would return in ten days or two weeks, and gave her instructions as to the course she should follow in the meantime, and he failed to return for five weeks, and if, in consequence of this failure to properly treat her during that interval, this injury resulted, it would seem that the jury were justified in finding that the defendant was negligent in this particular. A physician who undertakes the treatment of a patient is bound to exercise not only the skill required, but also care and attention, in attending his patient until he notifies the patient that his professional relations are terminated. A physician and surgeon engages to bring to the treatment of his patient care, skill, and knowledge; and while, when exercising these, he is not responsible for mere errors in judgment, he is chargeable with knowledge of the probable consequence of an injury, or of neglect in its treatment, or unskillful treatment (Du Bois v. Decker, 130 N. Y. 325, 29 N. E. 313, 14 L. R. A. 429); and when a physician is employed to attend upon a sick person his employment continues while the sickness lasts, and the relation of physician and patient continues, unless it is put an end to by the assent of the parties, or is revoked by the express dismissal of the physician. Potter v. Virgil, 67 Barb. 580. The case depends upon the interview on the 12th day of September, and I think the jury were justified in finding, if they be-

lieved the plaintiff's version of that interview, that the defendant had been negligent in the discharge of his duties which he had assumed in relation to the plaintiff.

The jury found a verdict for the plaintiff for $2,000, but the court, considering that excessive, ordered a new trial unless the plaintiff stipulated to reduce it to $500; and, the plaintiff so stipulating, judgment was entered for the amount of the verdict as reduced. Whatever may be said of the original verdict of $2,000, it is quite evident that $500 is not excessive. There was evidence tending to show that the only treatment practicable at this time was to fracture the bones where the union had taken place, and then to wire the bones in their proper position, and that the reasonable value for such an operation would be $500. After that operation the plaintiff would be in the position she was on the 12th day of September, but there is no certainty that there would be a union of bones.

I have examined the exceptions to rulings on evidence but none of them appear to be substantial. On the whole case, I think it was a question for the jury, and we are not justified in disturbing their verdict.

The judgment and order are affirmed, with costs. All concur.