GOLDA CAZZELL v. L. J. SCHOFIELD, Appellant.—8 S. W. (2d) 580.

Division One, May 18, 1928.

*M. D. Aber, W. V. Draffen* and *Montgomery, Rucker & Hayes* for appellant.

*C. W. Prince, E. A. Harris, James N. Beery, Roy D. Williams* and *Wm. H. Allen* for respondent.

SEDDON, C.—This is an action by plaintiff to recover damages for personal injuries, bodily suffering and illness, charged to have resulted from the alleged malpractice of defendant, who is a physician. The venue of the action was changed to the Circuit Court of Cooper County, where the cause was tried before a jury, resulting in a unanimous verdict for plaintiff, assessing her damages in the sum of $10,000. The action was originally instituted against four defendants, all physicians, but, at the conclusion of plaintiff's evidence-in-chief, the trial court instructed the jury to find for all of the defendants except the present appellant, whereupon the plaintiff made an involuntary dismissal as to all of the defendants, except Dr. Schofield. The defendant Schofield was allowed an appeal to this court from the adverse judgment against him *nisi.*

The petition of plaintiff was amended by interlineation at the commencement of the trial, and, as so amended, charges that "during the month of September, 1921, she, being pregnant, sought medical care and attention of the defendant, Dr. L. J. Schofield; that the said defendant, L. J. Schofield, accepted her as a patient and commenced treating plaintiff, giving her medical attention in the said month of September, 1921, . . . ; that thereafter, and up until the month of January, 1922, the said defendants did treat and render medical attention to this plaintiff, for the purpose of enabling her to a proper delivery of her said unborn child; that plaintiff's physical condition, under the treatment and care of said physicians, gradually grew worse, and in the month of January, 1922, after defendant L. J. Schofield had negligently failed to treat or attend upon plaintiff, though duly called, the plaintiff called into consultation other physicians and surgeons, and she was advised by said other physicians and surgeons that she was carrying a dead fetus; that at the time plaintiff was so advised by said other physicians and surgeons, and for several months prior thereto, plaintiff suffered great physical pain and torture; that while under the treatment and care of the defendants, and during the time defendants should have skilfully cared for plaintiff, her system became poisoned by auto-intoxication and her body and limbs suffered a toxic paralysis as a result of said auto-intoxication, due to carrying said dead fetus in her womb, or the putrefying membranes thereof, when, by the exercise of ordinary care and skill, said womb should have been emptied by surgical operation; that prior to the calling in of other physicians, plaintiff

and her husband both suggested to the defendants that they were of the opinion that the plaintiff was carrying a dead fetus; but said defendants carelessly and negligently treated, administered, cared for and advised plaintiff on the hypothesis that said fetus was not dead; that immediately upon calling other physicians and surgeons said physicians advised that an operation was necessary to save plaintiff's life, and thereupon she was reduced to a state of unconsciousness and operated upon by said last physicians and surgeons and the said fetus was removed from her womb, dead and in a decayed condition; that from the state of decay of said fetus at the time of its removal from the plaintiff's womb, the same had been dead and decaying for a period of several weeks; that as a result of the carelessness and negligence of the defendant aforesaid, plaintiff was rendered permanently sick, sore, lame, and weak, and has sustained a lasting nervous shock to her entire system; that as a result of carrying said dead fetus in her womb, plaintiff suffered from auto-intoxication and became paralyzed from toxic poison through her body and limbs, and she is unable to use said body and limbs and has lost her power of locomotion; that plaintiff's body at times becomes greatly swollen, tender and sore, and plaintiff has been compelled to remain in a state of helplessness in bed for many months, as a direct result of the complaints above referred to, all of which resulted directly from the carelessness and negligence of the defendants, in their improper care, treatment and attention of this plaintiff; that the plaintiff has lost and will in the future lose much of her natural rest and sleep; that she has become an invalid and will so continue to be an invalid the remainder of her life.'' The petition prays judgment in the sum of $20,000. The answer is a general denial of the allegations of the petition.

Plaintiff, at the time of the trial, was twenty-nine years of age and had been married about five years. Shortly after their marriage plaintiff and her husband removed from Kansas City to a farm near Centerview, Missouri, where they resided until plaintiff's illness in October, 1921. The evidence tends to show that plaintiff performed the usual household duties, including the laundry work, and attended to the care and raising of the poultry on the farm. Plaintiff is a graduate of the Warrensburg State Teachers' College, and for two years after her graduation she was a teacher in a public school, during which time she was absent only one day from her school duties. During the period of the late war, in order to release her father, a rural mail carrier, for farm work, she assumed, for a period of ninety days, her father's duties in daily carrying the mail, driving a team when the roads were muddy and driving an automobile when the roads were dry. So far as the record discloses, plaintiff had suffered no serious illness since she was ten or twelve years of age,

at which time she had some trouble with her eyes and received treatment therefor in Kansas City for some months from an eye specialist. Some time after the eye trouble, plaintiff was afflicted with partial deafness, which deafness apparently has continued. Defendant had been the physician of plaintiff, and of her family, during all of plaintiff's lifetime, having attended plaintiff's mother at the time of plaintiff's birth. In March or April, 1921, plaintiff consulted defendant, and received treatments from him, for a stomach or abdominal ailment, suspected at the time as being appendicitis, to which treatments defendant says plaintiff "responded moderately well, but not completely."

Plaintiff's last menstruation, prior to her illness which gave rise to the present action, occurred about August 19, 1921. In the early part of September, 1921, plaintiff developed a nausea, which increased in intensity to such an extent that she was removed from the farm where she resided with her husband to her mother's home in town early in October, 1921, and defendant was then called to treat and to attend plaintiff. Defendant diagnosed plaintiff's illness as being pernicious nausea due to pregnancy, and advised that plaintiff be kept in bed. Plaintiff's nausea did not abate, but apparently grew worse, reaching a stage where plaintiff could scarcely retain food or nutriment of any kind. At times, according to plaintiff's testimony, the nausea was so severe that she vomited clots of blood, and she subsisted principally upon a diet of Mellin's Food, being unable to retain cow's milk. Plaintiff gradually became weaker and lost weight because of her inability to retain nourishment and because of the frequent and violent paroxysms of nausea. In the latter part of November, 1921, plaintiff complained of a numbness in her feet and of a tingling sensation in her toes and fingers, and she experienced considerable disturbance and difficulty in urinating, being unable to urinate at all without being lifted from the bed and placed in a sitting posture.

On or about November 23, 1921, defendant brought three other physicians, as consultants, to plaintiff's bedside, apparently upon his own volition. According to defendant's testimony, two of the physicians at that time made a bimanual vaginal examination of plaintiff, and, as the result of such examination, one of the consulting physicians reported a slight catarrhal condition at the mouth of the uterus, and recommended the use of a local remedy, which was applied by defendant. The consulting physicians also recommended the use of corpus lutein, which drug was administered hypodermically to plaintiff in doses of one cubic centimeter to allay the nausea. The administration of corpus lutein was continued by defendant during the early part of December, 1921, with apparently successful results, in that plaintiff vomited less frequently than prior to the ad-

ministration of the drug. On the occasion of the visit of the four physicians on November 23, 1921, plaintiff's mother testified that she (plaintiff's mother) told defendant "if there was a baby there, it surely must be dead."

Plaintiff's evidence tended to show that, about the latter part of December, 1921, or the first of January, 1922, plaintiff and her husband, and her mother, noticed a vaginal discharge, brownish in color and sufficient to stain the bed clothing, and accompanied with a fetid and offensive odor. Plaintiff's husband described the odor of the vaginal discharge as being "like something decayed, something rotten." Plaintiff testified that she noticed the vaginal discharge every day, and that part of the time she had to wear a napkin, which, while not saturated with the discharge, was so badly stained thereby that the stain would not come out. The vaginal discharge, according to plaintiff's testimony, gradually increased in intensity, and later it contained brownish particles or pieces of mucus, which pieces of brownish mucus plaintiff testified she observed immediately before Christmas, 1921, and she told defendant thereof. Plaintiff testified that defendant, at the time plaintiff called his attention to the discharge, replied by saying that he would bring "another doctor to see that." By Christmas, 1921, according to plaintiff's evidence, plaintiff's legs had seemingly become paralyzed, so that she was unable to move them in bed without assistance, and her hands had also become affected, so that she was unable to feed herself or to use them readily. Plaintiff's evidence also tended to show that she experienced difficulty in breathing, and experienced the sensation of choking or smothering, at which times her mother would have to fan her in order that she might breathe more readily. Plaintiff testified that her vision failed until she could not see distinctly or clearly, and that "it seemed that somebody had dropped a drab colored veil" in front of her face, and that her suffering was so acute she could not sleep except fitfully. The mother of plaintiff testified that "she would take spells and be cold, and she could not get her breath." Plaintiff's evidence also tended to show that she suffered from lapses of memory after the latter part of November, 1921, and was unable at times to recognize visitors when they called at her bedside. At times, plaintiff testified, she had spells of semi-consciousness.

The evidence, without serious conflict, discloses that defendant was quite constant and regular in his attendance upon plaintiff from October 8 to December 28, 1921, defendant calling upon plaintiff at her mother's home frequently upon several successive days during said period, with an occasional intermission of a few days in defendant's visits. The testimony is conflicting, however, respecting the number of defendant's visits between December 28, 1921, and January 13, 1922, which latter date is conceded to have been the

last time defendant called upon plaintiff. Plaintiff, on the one hand, testified that defendant visited her almost continuously, and every day or every other day, up to January 10, 1922, and that thereafter, after an intermission of two or three days, defendant returned on January 13, 1922, the date of his final visit. Defendant, on the other hand, testified from a written record of his visits that he made no call upon plaintiff between December 28, 1921, and January 13, 1922, an interim of about sixteen days.

On January 13, 1922, defendant, accompanied by another physician, visited plaintiff, and, according to the testimony of defendant and the consulting physician, they then made a vaginal examination of plaintiff and discovered no mucous discharge from the vagina, and detected no unusual or fetid odor therefrom. As the result of such examination, the two physicians arrived at the conclusion that the fetus of the unborn child was not dead. Respecting the examination made on January 13, 1922, defendant testified: "On that day, while he (the consulting physician) was getting ready for the examination with a rubber glove and so forth, I took her temperature, which was normal. As he finished the examination—the bimanual examination—he put the finger glove to his nose and then placed it to mine and made the remark, 'There is no odor.' I said, 'No, there is no odor.' After that, I never saw her again."

Plaintiff's husband testified:

"Q. You were there on the 13th of January when Dr. Schofield and the other physician were there? A. Yes, sir.

"Q. And they made an examination of your wife that day? A. Yes, sir.

"Q. Did you at that time call Dr. Schofield's attention to any offensive odor? A. I didn't at that time, but I told him at that date that I believed the child was dead.

"Q. Did you call his attention to any offensive odor? A. I didn't know that I asked him if he noticed it, or anything of the kind. I don't remember speaking of it.

"Q. You didn't see any discharge that day? A. Not that day."

Respecting the issue of defendant's abandonment of plaintiff, the testimony is likewise somewhat conflicting. Plaintiff's husband testified:

"Q. Didn't he (defendant) treat her any after the 13th of January? A. No, sir.

"Q. Did you tell him to stop treating her? A. No, sir; he told me on the 13th of January, 'I will see her tomorrow or the next day.' 'Tomorrow or Sunday,' is the way he spoke.

"Q. What day was the 13th? A. Friday.

"Q. Did you call him or talk to him after that, when he didn't come? A. I went to the office and talked to him.

"Q. And what did he say? A. He said, 'I will see her this evening.'

"Q. What day was that? A. That was on Tuesday morning.

"Q. And then what? A. Well, he didn't come.

"Q. He didn't come? A. No, sir.

"Q. Did you see him after that? A. I saw him on the following Thursday morning, the 19th.

"Q. What did you say to him then? A. I didn't ask him to come that morning, but I went to the office to see him and he said, 'Well you might take Dr. Hoefner'—I believe it is Dr. Hoefner, an osteopathic doctor—'down there.' He said, 'He might help those limbs.'

"Q. Did he come down any more? A. No, sir.

"Q. What did you do? A. I called another doctor, Dr. Haughey.

"Q. Did Dr. Haughey respond to your call? A. Immediately; yes, sir. . . .

"Q. What was the date that that occurred, when Dr. Haughey came? A. January 19th. . . .

"Q. Now, had Mrs. Cazzell received any treatment from any physician between the last date that Dr. Schofield came and January 19th? A. Absolutely none.

"Q. Had you, by word of mouth or pen or telephone or in any way, indicated that you didn't want him to continue treating your wife? A. No, sir.

"Q. Did he give you any excuse for ceasing to treat her and caring for her? A. No, sir. . . .

"Q. Had you any hint or notice or warning from Dr. Schofield previous to that that he didn't care to treat your wife? A. No.

"Q. Was that the last advice that was given to you by Dr. Schofield, with reference to your wife's condition, when he told you to get an osteopath? A. Yes, sir.

"Q. When was that? A. That was on the 19th.

"Q. The 19th. A. Yes, sir. . . .

"Q. Mr. Cazzell, did you ever at any time consult or call any other physician to attend upon your wife than Dr. Schofield, previous to the time that you called Dr. Haughey? A. I did not.

"Q. Do you know of any other physician calling upon her or attending her in any way—any other physician than Dr. Schofield previous to the time that Dr. Haughey came? A. After the 13th, you mean?

"Q. At any time—did any other doctor ever treat her? A. No, none ever treated her.

"Q. Or call upon her? A. None, except the doctors that came with Dr. Schofield—is all."

Defendant testified:

"Q. Tell the jury if you abandoned this patient and refused to see her again? A. I did not.

"Q. Did her husband call you to come and see her after the 13th of January? A. No, sir.

"Q. Just tell the jury why you didn't go back again. A. When we left, the 13th of January, the understanding was, previous to that date, that we were to be informed along, by 'phone and so on, and a few days passed and I ascertained that another physician was seen at the house and, of course, that meant that I was out.

"Q. Had you been advised by the husband that he was going to call another physician? A. No, sir.

"Q. Or by any other member of the family? A. No, sir.

"Q. Had the husband come to you in your office, after the 13th, and had you suggested that he have an osteopath wait on his wife? A. No, sir; never."

Cross-examination:

"Q. Do you mean to say that another doctor was treating her— do you know of that? A. I didn't say that.

"Q. Well, you say you got it by hearsay? A. I understood that another doctor was there a number of days after the 13th and was taking care of her.

"Q. Was that your reason for discontinuing your services? A. I was supposed not to be needed any more.

"Q. Did you call them up and ask them if that were true? A. No, sir.

"Q. After you had been treating her in all this dreadful siege of sickness, you merely understood that another doctor—and upon that understanding you quit the case? A. No, sir. . . .

"Q. You knew how to get these people on the telephone, didn't you? A. Sure.

"Q. Mr. Cazzell came to your office, didn't he, after the 13th? A. No, sir.

"Q. He did not? A. No, sir.

"Q. Do you tell the jury that Mr. Cazzell did not come to your office after the 13th of January? A. I do.

"Q. And you made no effort to get in communication with him, or his wife, or his mother-in-law, or the family of this sick patient? A. Not after I understood that they had somebody else.

"Q. Didn't you tell Mr. Cazzell to get one of the 'rubbing doctors?' A. No, sir, I never did.

"Q. The last time he was at your office, on the 19th? A. No, sir, I never told a man that in my life."

Plaintiff testified, on cross-examination by defendant's counsel:

"Q. Then he (defendant) missed how long after the 9th or 10th of January? A. Two or three days.

"Q. Then he came again? A. After my husband asked him why he wasn't coming.

"Q. He came in answer to your husband on the 13th? A. Yes, sir.

"Q. And didn't come any more? A. No, my husband went at the time and talked to him after the 13th.

"Q. He told you about it at the time? A. What do you mean?

"Q. He told you that day that he went, that he had been down there? A. He told me he was going down to Dr. Schofield and see why he wasn't answering our calls.

"Q. Who had called him? A. My mother and my husband, and one time my sister called him, when I had a convulsion.

"Q. That was after the 13th? A. Yes, sir.

"Q. You remember all those things?. A. I remember those convulsions very distinctly."

Dr. Haughey was called to attend plaintiff on January 19, 1922, and saw plaintiff for the first time on the afternoon of that day. He testified that he found plaintiff in an emaciated and semi-conscious condition, with a temperature of 102, and a rather high or rapid pulse of about 180. He was told by the family, as a part of the history of the case, that plaintiff had had no bowel movement for two or three days and that she had not voided urine from 36 to 48 hours. After having obtained the history of plaintiff's case from the members of the family, Dr. Haughey advised the immediate emptying of the uterus and suggested that another physician be called in consultation upon the case, and one Dr. Anderson was called in consultation and came within twenty minutes after Dr. Haughey's arrival on the afternoon of January 19th. Dr. Anderson suggested that, instead of emptying the uterus, it was best to pack the uterus in order that the uterus would normally eject the fetus, which usually occurs within about 12 to 24 hours after the uterus has been packed. On the first visit, the two physicians, according to the testimony of Dr. Haughey, discovered part of a membrane in the vagina. The two physicians visited plaintiff again on the afternoon of the following day, January 20, and the uterus not having ejected the fetus, they repacked the uterus. On the second visit, they observed no membrane in the vagina, but there was a discharge, with a noticeable odor. At that time, plaintiff was unconscious. On the afternoon of the following day, Saturday, January 21, 1922, the two physicians met in consultation with a surgeon from Kansas City, one Dr. Sheldon, who advised the opening of the uterus by surgical operation and the removal of the fetus therefrom. Plaintiff was put under an anaesthetic, and the surgeon split the mouth of the womb and removed the contents, which consisted of the decomposed or macerated mass of the dead fetus, and parts of the membranous placenta or afterbirth. Dr. Haughey testified that, on

his first visit to plaintiff, the cervix of the womb was open, so as to admit one finger, indicating that "parts of the pregnancy had then passed out of the mouth of the womb," thus dilating the cervix.

Dr. Haughey, in testifying, expressed the opinion that the age or development of the fetus was about three and one-half or four months, and that he estimated that the fetus had been dead for a period of ten days to three weeks. Dr. Sheldon, the operating surgeon, who appeared as a witness on behalf of defendant, testified that "the size of the fetus and the afterbirth seemed about four and one-half to five months," and, when asked to express his opinion how long the fetus had been dead at the time of the operation, answered, "Well, there are many exceptions to the rule, but I think a week or ten days would have been sufficient to produce the changes that had occurred in the fetus." There was medical testimony adduced by defendant to the effect that decomposition or putrefaction is comparatively rapid in many cases after fetal death where there has been a rupture of the amniotic sac, oftentimes in from two or three days to a week. Dr. Haughey testified that there was some amniotic fluid found at the time of the operation, but was unable to say that the amniotic sac was intact, or was not ruptured, at the time of the operation.

The testimony of medical and surgical witnesses was adduced by defendant to the effect that the discovery of a dead fetus on January 21, when the operation was performed, is not conclusively indicative of the fact that the fetus was dead on January 13, the date of defendant's last visit upon plaintiff. On the other hand, there was medical testimony to the effect that chills, a sudden rise in temperature of the patient, increase in the pulse rate, loss of the power of locomotion, a brownish vaginal discharge accompanied with a fetid odor, dimness or loss of vision, difficulty in breathing, and cessation or abatement of vomiting, are symptomatical and indicative of fetal death, or of placental rupture, and of septic infection resulting therefrom, and suggest the remedy that the uterus should be emptied. One of the medical witnesses testified that the cessation of vomiting is "presumptive evidence of fetal death." Another medical witness testified that fetal death is to be looked for, or expected, when a woman patient vomits so violently and continuously that blood is vomited and the patient is unable to retain food or nutrition. Defendant's testimony was to the effect that plaintiff continued to vomit up to the time of his last visit on January 13, 1922, although her vomiting had been considerably checked and was somewhat less at that time than formerly. Plaintiff testified that the nausea continued from early in September, 1921, until a few days before she was operated upon in January, 1922, when the nausea seemed to pass off. Medical testimony was adduced by defendant that the

toxemia of pregnancy, accompanied by severe vomiting, does not indicate a dead fetus, and that usually it indicates the reverse. There was medical testimony to the effect that loss of locomotion, and the apparent paralysis of plaintiff's legs and hands, might have resulted from toxic or septic infection following placental rupture or fetal death.

Plaintiff's evidence tended to show that, following the operation in January, 1922, she was confined to bed much of the time until May; that for nineteen weeks, when not in bed, she was lifted from the bed and placed in an invalid chair; that she could not walk without assistance, or without using a chair, which she pushed before her for support; that in September, 1922, she was able to get about with the use of a cane; that, at the time of the trial, in October, 1923, she was still suffering disability and pain from her affliction; that her left leg pained her in walking, and that her ankles were so weak that she could not risk walking on a sidewalk, and that she had experienced several hard falls because her ankles were too weak to bear her weight on any uneven surface; that her limbs cramped so that she was unable to sleep comfortably; that one of her feet turns habitually so that her husband has to straighten it for her; and that, at the time of the trial, she had to be carried up the steps, and her heart was so weak that she could stand but little exertion. Plaintiff testified that she weighed 196 pounds in July, 1921, and during her illness she gradually lost weight until she weighed only 95 or 100 pounds at the time of the operation. She testified that she weighed 142 pounds at the time of the trial of the present action.

At the conclusion of all the testimony, defendant requested the giving of a peremptory instruction in the nature of a general demurrer to the evidence, which peremptory instruction was refused by the trial court. Thereupon the cause was submitted to the jury upon instructions given at the request of the respective parties to the action.

I. Appellant assigns error in the refusal of his requested peremptory instruction in the nature of a general demurrer to the evidence. The amended petition upon which the action was tried charges defendant, in substance and intendment, with negligence in two respects: (1) in failing to discover that the fetus of the unborn child was dead and in failing to remove the dead fetus, or in failing to empty the uterus of its contents, and (2) in abandoning plaintiff, his patient, without notice to the patient and without having been dismissed by the plaintiff. Plaintiff, by her instruction on the theory of recovery, submitted her case on both of said theories, or specifications, of defendant's negligence.

We have given scrutinous and critical study and analysis to the evidence, as set forth in the abstract of the record, and our examination and analysis of the evidence leads us to the inescapable conclusion that there is substantial evidence upon which to submit to the jury, for their determination, either and both of the aforesaid specifications, or charges, of negligence on the part of defendant.

There is substantial evidence in the record upon which to submit to the jury the issue of defendant's negligence in failing to diagnose or discover that the fetus of the unborn child was dead, and in failing to empty the uterus of its contents. Several of the medical expert witnesses testified that loss of locomotion, apparent paralysis of the patient's limbs, a rapid pulse, shortness of breath and difficulty in breathing, and a vaginal discharge accompanied by a fetid odor, all of which several symptoms plaintiff's evidence tends to show were exhibited by plaintiff prior to defendant's last visit on January 13, 1922, are strongly indicative of fetal death or of placental rupture, and were sufficient, to say the least, to raise the suspicion of a reasonably careful and skilful physician that fetal death or placental rupture had occurred. Plaintiff, her husband, and her mother, testified that they noticed a vaginal discharge accompanied by a fetid odor on or shortly prior to the first of January, 1922, and that defendant's attention was called thereto, defendant replying, when told of the vaginal discharge, that he wanted "some of the other doctors in the clinic to see that." Several of the medical experts, called to testify on behalf of defendant, testified that such a symptom or condition would indicate, or suggest, as the remedy, the emptying of the uterus. Dr. Robinson, upon cross-examination, testified:

"Q. Well, if they found the fetid odor and the discharge, that would indicate a putrefactive condition there? A. That would be a very, very strong suggestion of that.

"Q. And in your judgment as a skilled physician, you would take what steps in behalf of the patient after detecting that condition? A. Well, a condition of that sort would indicate an emptying of the uterus. . . .

"Q. But if the patient, as I say, is sinking in vitality, it is exposing the patient to a tremendous risk to allow that fetus to remain there after discovery of that fetid odor and the discharge? A. A discovery of a discharge from the vagina with a fetid odor, in a pregnant woman, as I have previously stated, will indicate that the uterus should be emptied.

"Q. And that should be done with all reasonable speed, should it not, the emptying of the uterus? A That is generally conceded by the profession."

Dr. Pearse testified on cross-examination:

"Q. Now, what does a fetid odor and a discharge indicate in a condition such as has been described to you . . . ? A. Indicates septic infection.

"Q. What do you mean by that? Death and putrefaction of the fetus and contents of the uterus? A. That would be one of the inferences you would draw, yes.

"Q. And when that is discernible what is the remedy to be used by skilful men? A. Securing the cleansing of the uterus and the removal of whatever infected tissue is causing the discharge."

While it is true that defendant, and the consulting physicians called by him, testified quite positively that on none of their several visits upon plaintiff did they find any vaginal discharge accompanied by a fetid odor, and while they denied emphatically that plaintiff, or the members of her family, had, at any time, called their attention to a vaginal discharge or a fetid odor therefrom, nevertheless, such conflict in the evidence was a matter for the jury to reconcile, weigh and determine as a question of fact. "Where the evidence is conflicting as to the facts on which the opinions of expert witnesses are based, and where the opinions of such witnesses, on a given state of facts in the case, materially differ, it is for the jury to determine, and their finding is conclusive." [30 Cyc. 1588; Vanhooser v. Berghoff, 90 Mo. 487, 496.] The jury, under our system of jurisprudence, are the sole judges of the credibility of the witnesses, and of the weight to be given to their testimony, and the trial court so instructed the jury in the present action upon the request of the defendant. [38 Cyc. 1518, 1521; Rearden v. Railroad Co., 215 Mo. 105, 140; Gordon v. Burris, 141 Mo. 602, 614; Cravens v. Hunter, 87 Mo. App. 456, 463.]

There is likewise substantial evidence upon which to submit to the jury the issue of defendant's abandonment of the plaintiff, without notice to the patient and without having been dismissed by the patient, although the evidence bearing upon such issue is likewise conflicting. Plaintiff's husband testified quite positively that defendant told him on Friday, January 13, 1922, the date of defendant's last visit upon plaintiff, "I will see her (plaintiff) tomorrow or the next day; tomorrow or Sunday," and that, on the following Tuesday, he went to defendant's office and talked to defendant, who then said, "I will see her this evening." Concededly, upon defendant's own testimony, he made no later visit or call upon plaintiff after Friday, January 13, 1922. Defendant gave as a reason for not continuing his attendance upon plaintiff after January 13, 1922, that he had "ascertained that another physician was seen at the house and, of course, that meant that I was out," and that "I was supposed not to be needed any more," although defendant apparently made no effort on his part to verify the information that another physician had been called to attend and to treat plaintiff, or

to get into communication with plaintiff, her husband, her mother, or any other member of the family of the patient. Plaintiff testified that her mother, her husband, and her sister, had called defendant to visit and attend her after January 13, 1922, and plaintiff's evidence furthermore tended to show that plaintiff, or her family, had not, "by word of mouth or pen or telephone or in any way," indicated to defendant that it was their desire that he discontinue his attendance or treatment of plaintiff. The evidence is uncontradicted that no physician was called to attend plaintiff after defendant's last visit on January 13, 1922, until Dr. Haughey was called on January 19, 1922, six days after defendant's last visit.

The established rule, or principle of law, prescribing the duty of a physician respecting his continuing attendance upon the patient, is thus stated in 30 Cyc. 1573: "A physician, responding to the call of a patient, thereby becomes engaged, in the absence of a special agreement, to attend to the case so long as it requires attention, unless he gives notice to the contrary or is discharged by the patient; and he is bound to use ordinary care and skill not only in his attendance, but in determining when it may be safely and properly discontinued." And the rule of actionable liability for abandonment of the patient by the physician is thus stated in 30 Cyc. 1576: "The unwarranted abandonment of a case at a critical period, resulting in increased pain and suffering on the part of the patient, will render the physician liable in damages."

The rule is thus stated in 21 Ruling Case Law 389, Section 34: "On engaging a physician to treat his case a patient impliedly engages him to attend throughout that illness, or until his services are dispensed with. The patient places himself in the hands of the physician and thereafter relies on the judgment and knowledge of the physician rather than on his own. A part of the correct treatment of the case is the careful and proper determination by the physician of the moment when the relation shall end. When the physician takes charge of a case and is employed to attend a patient, his employment, as well as the relation of physician and patient, continues until ended by the consent of the parties, or revoked by the dismissal of the physician, or until his services are no longer needed."

The foregoing established rules, as announced in the afore-cited texts, appear to be amply supported by judicial opinion, as expressed in the adjudicated cases. [Ballou v. Prescott, 64 Me. 305, 313; Dashiell v. Griffith, 84 Md. 363, 381; Gerken v. Plimpton, 70 N. Y. Supp. 793; Becker v. Janinski, 15 N. Y. Supp. 675, 676; Potter v. Virgil, 67 Barb. (N. Y.) 578, 581; Boom v. Reed, 69 Hun, (N. Y.) 426, 428; Gillette v. Tucker, 67 Ohio St. 106, 122; Lawson v. Cona-

way, 37 W. Va. 159, 165; Lathrope v. Flood (Cal.), 63 Pac. 1007, 1008.]

II. Error is assigned in the giving of Instruction No. 1 on behalf of plaintiff. Instruction No. 1 submitted to the jury plaintiff's two theories of defendant's negligence, namely, the issue, or question, of defendant's negligence in diagnosing plaintiff's ailment and in his treatment of plaintiff, and the issue, or question, of defendant's abandonment of plaintiff without notice to plaintiff of his intention to no longer attend or treat her. Appellant contends that there is no substantial evidence to support the giving of said instruction. We have ruled, in Paragraph I of this opinion, that there is substantial evidence in support of the several averments of the petition and that no error was committed by the trial court in refusing defendant's peremptory instruction in the nature of a general demurrer to the evidence. Plaintiff's Instruction No. 1 falls within the purview of both the pleadings and the evidence, and the contention of defendant that the instruction is not supported by the evidence must be denied.

Plaintiff's Instruction No. 1 told the jury that, in undertaking to care for and treat the plaintiff, "it became the duty of the defendant to exercise ordinary care in her behalf and employ such reasonable means and methods to relieve the plaintiff of her physical ailments as were ordinarily and customarily used by reasonably skilful and competent physicians in the locality where plaintiff was confined." Defendant's given Instructions A and B told the jury that "a physician or surgeon is not a warrantor or insurer of a cure and is not to be tried by the results of his remedies; that he is not liable for an honest mistake or an error of judgment if he exercised reasonable skill and diligence in arriving at his diagnosis and if he applied the proper treatment according to the diagnosis and was not negligent in his treatment," and that "the defendant cannot be made responsible in damages for errors in judgment or mere mistakes in matters of doubt or uncertainty, provided he exercised and used in the treatment of the plaintiff such reasonable skill and diligence as is ordinarily exercised and used in the practice of the profession of the defendant by those who practice under like conditions." The instructions, when read together, comport with the rule, or principle of law, announced and stated in 30 Cyc. 1573, as follows: "A physician or surgeon is bound to use reasonable knowledge and care in learning the condition of his patient, in ascertaining if an operation is necessary, in determining whether the time and place are proper, and in making a diagnosis of the case." Both the plaintiff and the defendant, by their requested and given instructions, invited and sought the finding and determination of the jury upon the question whether

or not defendant had failed to exercise reasonable and ordinary care and skill in diagnosing plaintiff's ailments and in treating her, and there being substantial evidence upon which to submit such question, as we have ruled, the defendant is bound by the finding and determination of the jury upon that question.

While plaintiff's Instruction No. 1 measured defendant's care, means and methods in the premises by those ordinarily and customarily used by reasonably skilful and competent physicians "in the locality where plaintiff was confined," rather than by those ordinarily and customarily used by reasonably skilful and competent physicians "in similar localities," yet the instruction imposed upon defendant a lesser degree of care and skill than was required of him, and the technical error in the instruction, if such there be, is favorable, rather than harmful, to defendant. [Krinard v. Westerman, 279 Mo. 680, 694.] Besides, the defendant, by his given Instruction B, voluntarily assumed and imposed upon himself, as the standard of his duty in the premises, the exercise and use, in the treatment of plaintiff, of "such reasonable skill and diligence as is ordinarily exercised and used in the practice of the profession of the defendant by those who practice under like conditions."

III. Appellant assigns error in the giving of plaintiff's Instruction No. 2 on the measure of damages, which permitted the jury to assess plaintiff's damages at a sum which will reasonably compensate her for her suffering and pain, if any, caused by the negligence, if any, of defendant, and "for any permanent injury that the plaintiff may have sustained, if any, . . . and for any pain and suffering, if any, that plaintiff may sustain in the future, caused by and through the negligence of the defendant." Appellant contends that there is no evidence upon which to predicate a recovery for permanent injury, or for future pain and suffering. Plaintiff's evidence tended to show that, at the time of the trial and more than a year after defendant's last visit on plaintiff, she was still suffering disability and pain from her ailment; that her ankles were so weak that she experienced difficulty in walking upon a sidewalk; that her limbs cramped so that her sleep was disturbed; that one of her feet turns habitually; that her heart was so weak that she could stand but little exertion; and that she had to be carried up the stairsteps. Plaintiff testified as a witness on her own behalf, and the jury had some ocular evidence, at least, of her physical condition upon which to draw a reasonable inference respecting the permanency of her injury and the reasonable probability, or certainty, of future pain and suffering. The instruction, by its terms, specially limited the amount of plaintiff's recovery by charging the jury that they could not "award plaintiff any damages that

she may have sustained by her sickness independent of any negligence of defendant, . . . but only such damages as are directly traceable to, and result from, such negligence of defendant, if any." We think there was sufficient evidence to justify the giving of the instruction and the submission to the jury of the matter of the permanency of plaintiff's injury and the reasonable certainty of future pain and suffering in estimating her damages. [Gharst v. Transit Co., 115 Mo. App. 408, 411; Frazier v. Smelting and Refining Co., 150 Mo. App. 419, 431; Quinley v. Traction Co., 180 Mo. App. 287, 303; Thompson v. Smith (Mo. Sup.), 253 S. W. 1023, 1029.]

IV. Appellant assigns error in the modification by the trial court of his Instruction E, which instruction was given, as modified, on behalf of defendant. The instruction, as given, is as follows: "The court instructs the jury that before plaintiff can recover she must establish by a preponderance of the credible testimony and to your reasonable satisfaction not only that the fetus which she was carrying was dead on the date when defendant last treated her, to-wit, the 13th day of January, 1922, but she must in addition thereto, in like manner, prove that the defendant knew, or by the exercise of reasonable care and skill on his part should have known, that such fetus was dead on or prior to the said 13th day of January, 1922, or that defendant was guilty of negligence in his treatment of her *or his negligent failure to treat her after said date*, and if plaintiff has failed to make such proof of either of such facts, then your verdict must be for the defendant." The trial court's modification of the instruction was the interlineation of the italicized clause. Appellant insists that the instruction, as so modified, assumes that defendant was guilty of negligence in failing to treat plaintiff after January 13, 1922. Abbreviating and shortening the instruction somewhat, it reads: "The court instructs the jury that before plaintiff can recover she must establish by a preponderance of the credible testimony and to your reasonable satisfaction . . . that defendant was guilty of negligence in his treatment of her, or his negligent failure to treat her." We see no assumption of any fact in the instruction. On the contrary, the instruction requires every fact referred to therein to be established and proved by a preponderance of the credible testimony and to the reasonable satisfaction of the jury, and, if plaintiff has failed to make such proof, the jury are directed to find for defendant. The assignment of error is not well grounded, and must be denied.

V. Appellant contends that Dr. Haughey, who attended plaintiff after defendant's last visit on January 13, 1922, and who appeared as a witness on behalf of plaintiff, was permitted to give an opinion based, in part, upon a history of the case which he obtained from members of plaintiff's family, and error is assigned in that respect.

Dr. Haughey was asked to tell the court and the jury the condition in which he found plaintiff on the afternoon of January 19, 1922, when he first saw her, and answered: "I found her in a semi-conscious condition, temperature of 102, pulse around 180, it was rather high. She was rather emaciated and in a semi-conscious condition. She could be aroused, but she would drop back to sleep again. From the history obtained from the family, she had had no bowel movement for two or three days and she had not voided urine from 36 to 48 hours, they said." After the witness had thus answered, the following occurred:

"DEFENDANT'S COUNSEL: We object to what they said to him. We object to history from members of the family who are interested in this. The expert's testimony must be based upon facts, and not upon history. . . . The hypothesis upon which he testifies must be facts. Upon this testimony is going to be based a hypothetical question. He can go ahead and tell what the whole world told him, with the understanding that it is not going to be the basis of the hypothetical question, but he can't give a history obtained from some member of the family and that be the basis of the hypothetical question.

THE COURT: I understand you. Objection overruled. Go ahead. (Defendant excepts to ruling).

"PLAINTIFF'S COUNSEL: Now proceed, Doctor.

"A. That is all the physical condition, as I observed it.

"Q. Well, what did you do? A. Then I obtained a history from the family.

"Q. For the purpose of enabling you to treat her? A. For the purpose of enabling me to treat her.

"Q. Now tell what that history was.

"DEFENDANT'S COUNSEL: We object to that.

"THE COURT: I think he has told that.

"PLAINTIFF'S COUNSEL: No, he was just getting to it. The patient was unable to talk—

"THE COURT: He has gotten her history now from the members of the family—

"PLAINTIFF'S COUNSEL: He has not related that history.

"THE COURT: He got it there that day, but he must not tell the jury, because some of the other members of the family have told it.

"PLAINTIFF'S COUNSEL: I have some authorities—

"THE COURT: I understand. He obtained the history. Now let him go ahead with that, as to his treatments.

"PLAINTIFF'S COUNSEL: Have you told all the history that you got with reference to the condition of the patient? A. Oh, no.

"PLAINTIFF'S COUNSEL: What was your treatment?"

It will be readily seen from the foregoing that Dr. Haughey's remark, or statement, concerning the history of the case as obtained from members of plaintiff's family, appears to have been wholly voluntary on his part, and in answer to an inquiry asking him to describe plaintiff's condition as he actually found it, or as he personally observed it. After witness had made such voluntary statement, defendant made no motion to strike out the voluntary statement of the witness, nor did defendant ask the court to direct the jury to disregard it. Subsequently, when the witness was asked to relate the history of the case, the court ruled that witness must not relate the history to the jury, on the ground that it was hearsay evidence. We have carefully read and analyzed the whole of Dr. Haughey's testimony, and we find therein no opinion expressed by the witness, in answer to any hypothetical question, which is based or predicated upon the history of the patient's case, or upon any fact obtained from any member of plaintiff's family, or from plaintiff herself. Neither is there any suggestion, however slight, in Dr. Haughey's testimony that, in treating plaintiff, or in arriving at his diagnosis of her ailment, he relied upon what he had been told of the history of her case, or that he acted otherwise than upon his own judgment and personal observation.

Learned counsel for appellant has directed our attention to a number of decisions of this court, and of the several courts of appeals of this State, holding that a medical expert witness must not be permitted to base his opinion, even in part, upon the past history of the patient's case, as related to him by the patient, or by other persons. We have read the several cited decisions, and other decisions not cited, and the rule stated therein, and now contended for by appellant, it may be conceded, appears to be well established in this State. However, under the state of the record in the present case, the rule as stated and applied in the cited cases, in our opinion, is inapplicable to the present record, inasmuch as the present record shows that the medical witness, Dr. Haughey, did not express an opinion based, even in part, upon the history of plaintiff's case as related to him either by plaintiff, or by the members of her family. But if there be technical error in the purely voluntary statement of the witness respecting the history of the case (and we think there was none), such technical error was waived by defendant in failing to move to strike the voluntary statement of the witness from the record. The assignment of error must therefore be denied.

VI. Appellant contends that Dr. Longan, a graduate and practicing osteopath, was incompetent to testify as a medical expert witness on behalf of plaintiff, because he does not belong to, or profess to follow the rules and principles of, the school or system of medicine of which defendant is a member. The record does not clearly show, if it shows at all, the rules or principles of what school or system of medicine defendant professes to follow, but we will assume that defendant does not practice the system commonly denominated as osteopathy. Dr. Longan testified that the same text-books and medical authorities on diagnosis are used in all of the several and different schools and systems of medicine, and that "the same methods are used in all schools in diagnosis." He further testified that his experience and knowledge as a practicing physician was acquired at osteopathic colleges and from his experience with other medical practitioners. The greater part of Dr. Longan's testimony had to do only with the subject of diagnosis, and not with the matter of treatment. In Grainger v. Still, 187 Mo. 197, 226, this division of this court, upon a review of many decisions and authorities, ruled that expert medical witnesses, regardless of the school or system of medicine to which they adhere, are competent to express an opinion as to matters of diagnosis and to testify as to any scientific fact that is, or ought to be, known to every physician and surgeon of every school or system. So far as we find, the foregoing juristic pronouncement has never been modified or overruled by this court, and the decision has been widely cited, as stating the true and proper rule, by legal textwriters and by the courts of foreign jurisdictions.

Appellant's assignment of error in this court is directed solely to the competency of Dr. Longan to testify as a witness in the case, and is not directed to the competency or admissibility of any specific part of his testimony. In other words, appellant has not pointed out to us what particular testimony of the witness is claimed to have been improperly admitted, but makes the general assignment that the witness was incompetent to testify as a witness and, therefore, that all of his testimony should have been excluded. Under our ruling in Grainger v. Still, supra, the witness was competent to express his opinion as to matters of diagnosis and to testify to any scientific fact that ought to be known to every physician and surgeon of every school or system, so that the testimony of the witness on matters of diagnosis was competent and properly admissible. This court has ruled that evidence which is admissible for any purpose cannot be excluded simply because it is inadmissible for other purposes, and, where the evidence is competent for any purpose, it is the duty of the trial court to admit it when offered, and, furthermore, if it is desired to have it limited in its effect, then it is the duty of the opposite party to ask an instruction for that purpose. [Standard Mill-

ing Co. v. Transit Co., 122 Mo. 258, 273; Sotebier. v. Transit Co., 203 Mo. 702, 721.] Unless an appellant points out the particular evidence claimed to have been improperly admitted, a general objection will not be considered, for it is not the province of this court to search the record for errors not specifically called to our attention. [Sanzenbacher v. Santhuff, 220 Mo. 274, 282; Christine v. Luyties, 280 Mo. 416, 431; Maloney v. Railways Co., 237 S. W. 509, 512; Barnett v. Hastain, 256 S. W. 750, 753; Doody v. Woolen Mills Co., 274 S. W. 692, 699.] The assignment must be ruled against appellant.

VII. Error is assigned in that the trial court permitted plaintiff's counsel, over defendant's objections, to inquire on *voir dire* examination of the jury panel whether any of the jurors were stockholders or agents of a certain medical protective association, or insurance company, and whether they, or their relatives, had any connection with such company. The record discloses that, on *voir dire* examination of the jury panel, the following occurred:

"MR. WILLIAMS: Are any of you stockholders in the Fort Wayne—

"MR. RUCKER: If you would like to have the jury excluded, we will argue this question.

"MR. PRINCE: We have a decision—

"MR. RUCKER: Yes, I know what that decision is. Let's go in here and argue it."

Whereupon, the court, the counsel for plaintiff and defendants, and the reporter retired to the consultation room, where the following occurred:

"MR. WILLIAMS (dictating): In response to the request of the court to ask the question in the absence of the jury, Mr. Williams says: 'Gentlemen, are any of you stockholders in the Medical Protective Company of Fort Wayne, Indiana, an insurance company that insures physicians and surgeons against malpractice cases?'

"MR. RUCKER: We object to the question on the *voir dire* examination, for the reason, first, that the Medical Protective Company of Fort Wayne, Indiana, is a foreign corporation, has no stockholders residing in Missouri; and for the further reason that the conclusion of the question injects into the case an element which is unfair and prejudicial to the defendants' rights. If the question is permitted to be asked at all, it should be confined to the single inquiry as to whether the jurors, or any of them, are stockholders in the company named, without explaining to the jury what character of insurance the company writes.

"THE COURT: Objection sustained to that. Let the question be asked whether or not they are stockholders in that company.

"To which latter portion of the court's ruling, the defendants, by their counsel, then and there at the time duly excepted and saved their exceptions."

Whereupon, the court, counsel aforesaid and reporter returned into the courtroom.

"MR. WILLIAMS (addressing the twelve men in the jury box): Gentlemen, are any of you stockholders in the Fort Wayne Medical Protective Association? Do any of you own stock in the Fort Wayne Medical Protective Association? Gentlemen, do any of you know any of the agents or the representatives, as far as you know, of the Fort Wayne Medical Protective Association? Any of you? Have any of you ever engaged in selling insurance—

"MR. RUCKER: If the Court please, I object to any further inquiry about—

"MR. WILLIAMS: I am going to ask if they ever represented that company.

"THE COURT: You can ask if they ever represented the company.

"To which ruling of the court the defendants, by their counsel, then and there at the time duly excepted and saved their exceptions.

"MR. WILLIAMS: Did you sell insurance for a while, Mr. Gross?

"MR. GROSS: Yes.

"MR. WILLIAMS: Did any of you ever represent, in any capacity, or have any dealings with, the Fort Wayne Medical Protective Association?

"MR. RUCKER: We object to any further inquiry along that line as an attempt to inject a false issue. (No ruling.)

"MR. WILLIAMS (addressing six other men on the panel): Are any of you stockholders in the Fort Wayne Medical Association? Are any of your relatives, or anyone in whom you are interested, associated with that company in any capacity that you know of? Do you know any of the agents of the Fort Wayne Medical Protective Association? Have any of you directly or indirectly represented the Fort Wayne Medical Protective Association? You don't know whether your brother-in-law, Mr. McMahan, whether your brother-in-law is a member of the Fort Wayne Medical Protective Association?

"MR. McMAHAN: I never heard of it, I never heard the name before."

From the foregoing occurrence, or procedure, as shown by the record, it appears that the trial judge and the counsel for the respective parties retired to the consultation room, outside the presence of the jury panel, where the manner of the interrogation of the jury panel and the form of the questions to be asked on *voir dire* examination were discussed by court and counsel, and ruled by the court. While counsel for defendant was not asked specifically by the court whether the named insurance company was directly or indirectly

interested in the case, as the insurer of defendant, nevertheless, so far as the record shows, counsel for defendant did not say, or even intimate, that the named insurance company was not an insurer of defendant; nor did counsel offer, or attempt to offer, testimony to show that the named company was not an insurer of defendant and was not in any way interested in the case. Neither has there been any such disclaimer made by defendant in brief or argument in this court. There is nothing in the record before us to indicate that counsel for plaintiff was acting in bad faith in propounding the questions to the prospective jurors, or for the mere purpose of prejudicing them, and, in the absence of such showing, the assumption may be indulged by us that plaintiff's counsel was acting in good faith. [Jablonowski v. Modern Cap Mfg. Co., 312 Mo. 173, 201.] Upon the record before us, no error was committed by the trial court in overruling defendant's objections to the examination of the jury panel. [Kinney v. Railway Co., 261 Mo. 97, 114; Wagner v. Construction Co. (Mo. Sup.), 220 S. W. 890, 897; Melican v. Construction Co. (Mo. Sup.), 278 S. W. 361, 366.]

VIII. Lastly, it is urged as error that the trial court failed and refused to set aside the verdict of the jury, assessing plaintiff's damages in the sum of $10,000, as being unreasonable and excessive. Judgment for $10,000 in favor of plaintiff and against defendant was entered of record upon the date of the return of the verdict, October 26, 1923. At a subsequent date and a later term of the court, the court made and entered the following order: "And now on the 19th day of February, 1924, the same being one of the days of the adjourned term of the regular January, 1924, term of this court, defendant's motion for a new trial herein came regularly on for presentation to the court. And the court, after hearing said motion read, the argument of counsel, and being fully advised in the premises, doth find that the verdict of $10,000 awarded to the plaintiff by the jury is excessive and doth decree and order that said verdict be reduced to $6000, and that the motion for a new trial be overruled." No order was made and entered by the court requiring plaintiff to file or enter a remittitur, on penalty of sustaining defendant's motion for new trial in the event such remittitur be not made; nor was the judgment for $10,000 entered upon the verdict set aside by the court, nor was any new and different judgment entered. Counsel for appellant, in his brief filed herein, frankly states his opinion that the trial court had no authority to reduce the amount of the verdict without giving plaintiff the choice of entering a remittitur or of submitting to a new trial. In 38 Cyc. 1901, it is said: "But where a verdict is too large to meet the approval of the trial court, it is error

for the court to reduce it and enter judgment for the reduced amount, without giving plaintiff an option to accept that amount or submit to a new trial.'' The rule announced in the text is amply supported by judicial authority, as shown by the cases cited in the footnote of the text. Therefore, the order of the trial court reducing the amount of the verdict was *coram non judice*, and of no force or effect.

Appellant insists, however, that the trial court clearly ·indicated, by the order entered, that the court deemed the amount of the verdict unreasonable and excessive, and that the court should therefore have awarded defendant a new trial. Without reiterating the evidence respecting plaintiff's physical injuries and suffering, it is sufficient to say that we do not regard the amount of the verdict as being so unreasonable and excessive as to justify our disturbing the finding and determination of the jury thereon.

Our attention is not directed to any reversible error on the part of the trial court, and finding no reversible error upon the record before us, the verdict of the jury upon the issues submitted is conclusive upon this court.

The judgment *nisi* for $10,000, entered upon the verdict of the jury, must therefore be affirmed, and it is so ordered. *Lindsay* and *Ellison, CC.,* concur.

PER CURIAM:—The foregoing opinion by SEDDON, C., is adopted as the opinion of the court. All of the judges concur.