EFFIE ROWE, RESPONDENT, v. MISSOURI NATIONAL LIFE INSURANCE COMPANY, A CORPORATION, APPELLANT.—*96 S. W. (2d) 889.*

St. Louis Court of Appeals. Opinion filed October 6, 1936.

Motion for rehearing overruled Oct. 20, 1936.

*Robert T. Hensley* and *Robert L. Maul* for appellant.

*Anderson & Whittington* for respondent.

730

HOSTETTER, P. J.—This is a suit on a policy of insurance for $1000 issued May 2, 1932, on the life of Joseph A. Rowe, who died on July 6, 1933. The plaintiff is the widow of the insured and the beneficiary named in the policy. The defendant is a Missouri Corporation, and, at the time of issuance of the policy was doing business under a certificate authorizing it to do the business of life, health and accident insurance on the stipulated premium plan. The death of the insured occurred a little over fourteen months after the issuance and delivery of the policy.

Under the heading of Agreements and Conditions, which constituted a part of the policy, are the following clauses, viz:

"First: This policy shall not take effect if the insured should die before the date hereof, or if on said date the insured is not in sound health, but in such event the premiums paid hereon, if any, shall be returned.

"Third: Proofs of claims under this Policy shall be made upon blanks furnished by the Company, and shall contain an answer to each question propounded to the claimant, physician or other per-

son; and shall contain the record, evidence and verdict of any coroner's inquest that may have been held.

"Sixth: This Policy, together with the application, contains the entire agreement between the Company and the Insured, and the holder and owner hereof. No person, except the President or Secretary, has power to make or modify this Policy, or extend the time of payments of premiums. No agent has power in behalf of the Company to waive any forfeiture, or to bind the Company, by making any promises, or by making or receiving any representations or information."

Under the printed instructions issued by defendant for preparing proofs of death appears the following:

"When a Coroner's inquest has been held a copy of the verdict duly certified must be furnished with the proofs of death. Whenever the circumstances may in the opinion of the Company, require it, a certified copy of the evidence will be necessary.

"Undertaker's affidavit must be made by the undertaker or sexton who interred the body of the deceased. If body was prepared for burial by one undertaker and interred by another, separate affidavits must be made by each undertaker."

In the application for the insurance, which was dated May 2, 1932, and signed by the insured, he answered questions to the effect that he would be fifty-five years old next birthday; that he had no insurance in any other company; that he was five feet eight inches tall and weighed 165 pounds; that he was married and his occupation was that of laborer. And made the following answers to the questions set out, viz:

"A. What is the present condition of health? Good.

"B. When last sick? Month   Year 1927.

"C. Of what disease? Cold.

"D. Does any physical or mental defect or infirmity exist? No."

It was also set out in said application as follows:

"17. I Hereby Represent and Warrant That the answers to the questions in this application are correct and true to the best of my knowledge and belief; and agree that they shall become a part of the contract of Insurance applied for."

Following the signature of the insured to this application appears the instructions given by the company and the answers and certification made by the company's agent, J. L. Smith, viz:

"This certificate must in all cases be signed by the agent himself after the above questions have been answered and he has seen the party whose life is proposed for Insurance and is satisfied that same is a first-class risk.

"A. Is the applicant a relative of yours? No.

"B. What amount of premium have you collected in advance? 3.42 cts.

"I certify that I have this 2nd day of May, 1932, personally seen and questioned the applicant herein named and believe the answers to be correct and true, and I recommend the Company to accept the risk.

"J. L. Smith, Agent."

In claimant's affidavit constituting a part of the proofs of death were the following questions and answers:

"21. Date of death of deceased? 7/6/33.

"22. Have you seen and identified the remains of the deceased? Yes.

"23. When did the health of the deceased first begin to be affected? (State fully first symptoms of the illness) Sudden death.

"24. What was the remote cause of death? Myocarditis.

"25. What was the immediate cause of death? See Coroner's copy.

"26. What was the duration of last illness? (State all facts regarding cause and circumstances of death.) See Coroner's copy.

. . .

"28. Give names and addresses of every physician who attended, prescribed for or was consulted by the deceased at any time during the past five years. None.

"29. Give names and addresses of attending physician at last illness or since health of deceased began to be affected? None."

The suit was instituted on November 15, 1933, in the Circuit Court of the City of St. Louis, Missouri. The petition was in conventional form, averring compliance with the conditions of the policy, both by plaintiff and the insured; payment of all premiums; the furnishing of due proofs of death; the surrender of policy to defendant as required; the latter's refusal to pay, and a demand for judgment for $1000 plus interest, together with ten per cent for vexatious refusal to pay, and reasonable attorneys' fee.

The amended answer, on which the cause was tried, consisted of a general denial, coupled with a defense to the effect that insured was guilty of a breach of warranty and fraud in the application for procurance of the insurance in that he represented his condition of health at that time as being good; that he was last sick in 1927 with a cold and that no physical or mental infirmity existed at the time the application was signed by him; and that said warranties and representations were false and untrue and that his physical defect at that time was endocarditis with hypertrophy and that such physical defect or infirmity actually contributed to the death of insured; and the recital that tender was made to the plaintiff of $65, being the total premiums received by the defendant on the policy, together with interest thereon.

Plaintiff's reply was a general denial.

The case was tried in the Circuit Court on the 13th and 14th of

November, 1934, resulting in a verdict returned by the jury for $1000 plus interest, aggregating $1060, on which a judgment was entered, and, after an ineffective motion for a new trial, the defendant brings the cause to this court by appeal for review.

In this court the only assignment of error made by the appealing defendant is that the trial court erred in refusing to sustain defendant's instruction in the nature of a demurrer to the evidence offered at the close of all the testimony.

The plaintiff, at the close of all the testimony, offered an instruction requesting the court to direct a verdict in her favor.

While plaintiff was on the witness stand she testified, *inter alia,* that she had been married to Joseph Rowe for thirty-three years; that during the last two or three years of his life he worked at the Brown Shoe Factory in the shipping department; that she had possession of the policy at the time of his death and afterwards sent it to the insurance company's office by her brother; that the company sent her two papers and she took them to the undertaker, who filled them out, and that she signed them; that she did not know of what her husband died.

The coroner's inquest was held by Deputy Coroner, Harold L. Schulz on July 7, 1933, and set out a finding to the effect that deceased came to his death on the 6th day of July, 1933, at about 1:45 o'clock P. M. enroute to city hospital from chronic endocarditis with hypertrophy.

Dr. Ralph L. Thompson testified as a witness on behalf of defendant that he observed the autopsy on the body of Joseph A. Rowe, but did not perform it, but that it was performed by Dr. Nawrocki, a member of the Coroner's staff of the City of St. Louis; that the heart showed marked hypertrophy and dilation with chronic myocarditis. In answer to questions as to how long this condition had existed he said: "It is impossible in a case like this to say definitely," but he finally fixed it at ten years.

Dr. Joseph Nawrocki, also called as a witness by defendant, testified that he performed an autopsy on the body of deceased, Joseph A. Rowe, on July 6, 1933; that he found the heart very much enlarged and what physicians call hypertrophy; that the muscular tissue was inflamed and what they call endocarditis. He fixed the time that such conditions existed at five years.

Neither one of these physicians who testified on behalf of defendant ever saw the deceased, Joseph A. Rowe, in his lifetime, and, consequently, never treated him and gained whatever information they had, or claimed they had, from their view of the organs at the autopsy on the body.

The defendant charged in its amended answer that the answers of the insured, contained in his application, in respect to his being in good health at that time were false and were made by him for

the purpose of deceiving the defendant and defrauding it and that had he not made such false statement and such material misrep-resentation for the purpose of deceiving and defrauding defendant, it would not have issued the policy sued on. Suffice it to say that defendant wholly failed to support such allegations. If the insured was not in good health at the time of the issuance of the policy there is no testimony in the case to the effect that he knew that he was not in good health at such time. On the contrary, all the testimony bearing on that issue tended to negative the charge that he had any knowledge of any alleged bad health or infirmity at said time.

However, it seems to be the holding of our Supreme Court in the case of Kirk v. Metropolitan Life Insurance Co. (Mo. Sup.), 81 S. W. (2d) 333, that lack of knowledge of the existence of the dis-ease by the insured would not, in and of itself, completely negative a charge that he was diseased at such time, but we think that such lack of knowledge of its existence on the part of the insured at the time of the issuance of the policy would be a circumstance proper to be considered by the jury in explaining or contradicting the alleged admissions against interest, if any there be contained, in the proofs of death furnished by the plaintiff.

The testimony of the six lay witnesses, called by plaintiff in this particular case, was, we think proper to be considered by the jury on the question of the existence or non-existence of the disease (described as being the cause of his death) at the time of the is-suance of the policy and the making of insured's application. They all testified that insured did heavy work for many years prior to his death; that he never complained of being ill, that he always looked and acted like a healthy man; that he lost no time from his work on account of illness; that his health appeared to be good, and that it was good.

One witness, Frank Hogan, shipping clerk for the Brown Shoe Company, testified that insured worked under him in the same room and the same department for the past year prior to his death and in another department, the boiler room, for the past five years; that he was in good health all the time; that he only lost about one day from his work and that was when he had some teeth pulled.

Other witnesses, called by plaintiff in rebuttal, testified that Rowe's work in the shipping room at the Brown Shoe Company was loading trucks with boxes weighing twenty-five to eighty pounds, mostly forty pounds, and that his general appearance and conduct showed good health and that he was always jovial and never complained.

Another witness, Charles Grundy, called by plaintiff, testified that he knew Rowe for ten years and roomed with him for the two years just preceding his death and that he worked regularly; that he never heard him complain and had the appearance of being in good health.

Man is mortal; physical death is inevitable. Every human, even in prenatal life, bears in the body the seeds of its ultimate dissolution. So that, literally speaking, no human can be classified as absolutely free from disease, because of the presence of the seeds of destruction which need only to fructify sufficiently in order to bring death to the body. Moses, the reputed author of the Pentateuch, records an exception to the rule in the translation of Enoch when he was three hundred and sixty-five years old, whereby he escaped the pangs of physical death; the cryptic account of this miracle is found in Genesis 5:24, and reads as follows: "And Enoch walked with God; and he *was* not; for God took him."

But no reasonable mind would, or could, adopt this narrow and literal interpretation whereby all humans would be classified as being diseased because of the absolutely known presence of the death producing germs in the body.

In the instant case, neither one of the physicians, who were present at the autopsy performed on the insured's body, ever saw him or treated him in life. They had no history of the case. They had no personal knowledge of the insured. The length of time the disease, of which he died, had existed in the body or had fructified so as to become imminently dangerous was unknown to them, and their testimony on that point was a mere guess. This is borne out by the fact that one guessed it ten years and the other five years and one of the two, thus testifying, admitted that it was impossible to tell in a case like that of the insured.

The plaintiff, in her affidavit, constituting a part of her proofs of death, set out that her husband, the insured, died from myocraditis simply (not chronic myocarditis). And, in answer to further questions in her said affidavit, she stated that insured had no attending physicians; that she did not make any written statements or affidavits of physicians a part of her proofs of death, and that she did not know of any disease her husband ever had since childhood; that she had known him for thirty-two years, and had been married to him that length of time; that at the time of the issuance of the policy his occupation was that of laborer in the Brown Shoe Factory shipping room for one year of the five years preceding his death and four years stationary fireman; that she had seen and identified the remains of her deceased husband; that deceased had never had any one of a multitude of diseases inquired about.

The statement of defendant's agent, at the time he procured the application signed by insured, is, we think, important and proper to be considered by a jury in determining the question as to whether the disease of which insured died existed at the time of the issuance of the policy. He was defendant's agent for the purpose of passing on the health of the insured at the time of the issuance of the policy. In fact, the printed directions, which the company gave to its agent,

set out that the certificate must in all cases be signed by the agent himself after the questions contained were answered and also to set out that he had seen the party whose life was proposed for insurance and was satisfied that the same was a first class risk, and, he followed these instructions by signing a statement to the effect that he saw and questioned the applicant and believed the answers to be correct and true and that he recommended the company to accept the risk. That was some evidence that the insured was in sound health at the time.

While it is true that there is no showing that J. L. Smith, the Company's agent, was a physician, but the defendant company seemed to have confidence in his judgment and by its printed instructions required him to sign the certificate himself after seeing that all questions contained in the application had been answered by the applicant and further requiring him to see the applicant for insurance and to become "satisfied that same is a first class risk," and thereby admitting that its agent must have possessed some qualification to pass on the physical condition of the applicant.

We are also of the opinion that the coroner's inquest and the verdict reached at that inquest were not a part of the proofs of death which would bind plaintiff as an admission against interest. The defendant itself, in its printed instructions for preparing the proofs of death, used this language: "When a coroner's inquest has been held, a copy of the verdict duly certified must be furnished *with the proofs of death.*" Thus, in effect, admitting that it was something separate and apart from the proofs of death. The same inference is deducible from the form of receipt which the defendant made when the plaintiff surrendered the policy and delivered the proofs of death to the defendant, as she was required to do. The receipt reads as follows: "July 12, 1933. Received policy No. 2214 and proofs of death and coroner's report on Joseph Rowe, deceased. Signed, Missouri National Life Insurance Company. L. A. O'Leary," thereby indicating that the coroner's report is something separate from, and independent of, the proofs of death. So that, whatever the coroner's report contained, could not, in our judgment, be considered as an admission against interest on the part of the plaintiff.

There was also a rubber stamp clause on the policy reading as follows: "This policy incontestable from date of issue." This was stamped in two places over the printed incontestability clause, which printed clause read as follows: "Incontestability. This policy shall be incontestable after two years from the date of issue except for fraud, non-payment of premium, misstatement of age, and restrictions as to military and naval service herein contained."

The proofs of death do not state the immediate cause of death

or suggest that insured was afflicted with any infirmity at the time of making applications or at the time of delivery of the policy. The undertaker's affidavit merely covered data relating to the identification of the body of the deceased and contained no reference as to what the disease was from which the deceased Joseph A. Rowe died, and, as stated heretofore, the claimant's affidavit, which was a part of the proofs of death, contained merely the statement that the remote cause of death was myocarditis, and, while in answer to the questions as to the immediate cause of death and the duration of last illness, the answers were "See coroner's copy," the copy of the coroner's report referred to did not contain any statement either directly or by implication that the disease which caused the insured's death existed for any particular length of time prior thereto. There was no statement in the coroner's report of the duration of the last illness.

Under the facts shown in evidence we do not regard the coroner's report as properly constituting any portion of the proofs of death. It was not submitted by the plaintiff nor accepted by the defendant as a part of such proofs, but as an independent document calculated to furnish defendant with additional information independent of that contained in the form of proofs of death, by which plaintiff is bound under the law.

The introduction of the coroner's report was objected to by the plaintiff. It was clearly not a part of the proofs of death and should not have been admitted in testimony and should have been excluded on plaintiff's objection that it was hearsay. If the fact of Joseph A. Rowe's death was an issue it might have been receivable for the purpose of proving his death, but the death of Joseph A. Rowe was admitted by the pleadings. The plaintiff, in her petition, stated, among other things, the death of Joseph A. Rowe, and defendant in its answer admitted his death. Therefore, the coroner's report was not proper to be admitted in evidence to prove something which was not in dispute and which the pleadings of both plaintiff and defendant conceded to exist, to-wit: the death of Joseph A. Rowe.

So that, as we view the situation, the alleged admissions of plaintiff in the proofs of death did not, in point of fact, amount to an admission that Joseph A. Rowe was afflicted with the disease, from which he died, at the time of his signing the application and at the time of the issuance of the policy. But assuming that it did contain such an admission on the part of the plaintiff, we think that the facts and circumstances brought out in the instant case furnish an explanation which controverted, explained and repelled the force of such admission to such an extent as to make the question of whether or not the insured was suffering from the disease, of which

he died, at the time of the signing and issuance of the policy a question for the jury to determine.

The instant case is clearly distinguishable from the case of Kirk v. Metropolitan Life Insurance Co. (Mo. Sup.), 81 S. W. (2d) 333. In the Kirk case the death of insured from the disease of tuberculosis occurred within less than five months after the issuance of the policy, whereas, in the instant case the death occurred in a little over fourteen months after the issuance of the policy.

In the Kirk case the proofs of death contained the sworn statements of three attending physicians and one of the three stated that he knew from his personal knowledge that deceased had had tuberculosis for one year and the other physicians had likewise examined him and treated him during his lifetime and testified from actual knowledge derived from treating him. In the instant case there was no attending physician and no one had ever treated the insured or had any personal knowledge of him growing out of any treatment or history given by him.

In the Kirk case the sworn statements of the claimants in the proofs of death showed that the insured died of tuberculosis on December 11, 1923, and that his last illness began five months before death. In the instant case no such admissions whatever were made by the plaintiff.

In the Kirk case the plaintiff did not demur to defendant's evidence or ask for a directed verdict. In the instant case plaintiff did demur to defendant's evidence and did ask for a directed verdict.

In the Kirk case there was no showing on the part of lay witnesses that deceased was healthy or even looked healthy and free from disease, whereas, in the instant case all of the witnesses, consisting of a number of persons who knew the insured intimately, testified positively to him being in good health and working regularly, doing heavy work, and making no complaint of feeling ill or sick, and lost no time from his work except a day when he had some teeth pulled.

In the Kirk case the Supreme Court gave no weight to the testimony of the lay witnesses called by plaintiff in rebuttal because of the weakness and meagerness of their testimony and their failure to give affirmative proof of the insured's good health, whereas, in the instant case the testimony given by the non-medical witnesses was replete with positive statements of the good health of the insured, his ability to work, his doing heavy work, his lack of complaint of illness and his cheerfulness, all of which indicated good health.

Besides, any person possessing ordinary common sense, layman or physician, knows that a person afflicted with heart disease, who does heavy work, as the insured did in the instant case, necessarily

causes the heart, the big pump, to be overworked, thereby bringing the final collapse closer to the beginning of the disease.

We are making this comparison between the Kirk case and the instant case because the defendant claims, in its brief, that the instant case is so similar to the Kirk case in which the plaintiff's judgment was reversed outright. Therefore, we have differentiated the instant case from the Kirk case and have reached the conclusion that whatever admissions against interest may have been drawn from the proofs of death furnished by the plaintiff have been thoroughly explained and controverted by all the facts and surrounding circumstances as to justify the submission of the case to the jury and allow them to determine the fact as to whether or not the insured was suffering from the disease from which he died at the time of his signing the application for the insurance and at the time of the issuance of the policy.

We think that the trial court properly refused the instruction in the nature of a demurrer to the evidence offered by the defendant, and that being the only issue raised by the defendant in its brief, it follows that the judgment of the trial court should be affirmed, and, it is so ordered. *Becker* and *McCullen, JJ.*, concur.