FERN BAIRD, RESPONDENT, V. NATIONAL HEALTH FOUNDATION ET AL.— 144 S. W. (2d) 850.

Kansas City Court of Appeals. Opinion filed July 1, 1940.

596

*Hook & Thomas* for appellants.

*S. R. Stone, Reginald A. Smith* and *Walter A. Raymond* for respondent.

SPERRY, C.—Fern Baird, plaintiff, sued National Health Foundation, a Voluntary Unincorporated Association, M. K. Kelly, Trustee thereof, Dr. Eugene Carbaugh, Dr. Glenn C. Carbaugh, and Dr. J. Earle Donaldson, defendants, for damages alleged to have been suffered by her as a result of the negligence of defendants in treating her for an illness. Plaintiff had a verdict and judgment against all defendants, from which judgment said defendants have appealed.

The record facts in this case, by reason of the large number of defendants, as well as the various dates and sets of circumstances surrounding the various transactions, are rather difficult to set out briefly and intelligibly. Because of the above-stated situation, and because the plaintiff had the verdict, we will state the facts most favorable to plaintiff and will not attempt to state facts unfavorable to her claim. That is the universal rule after verdict.

The National Health Foundation, hereinafter referred to as Foundation, is a voluntary association which contracts with various people, who thereby become members, to furnish medical service to such members. Such members are issued a certificate by the Foundation through M. K. Kelly, its trustee; and such certificate holders agree ιο pay a monthly premium as consideration for such membership and for such medical services as are mentioned therein. Plaintiff was a member in good standing on January 8, 1938, and until February 15, 1938. According to the terms of the certificate issued to her, M. K. Kelly, trustee, was required to, and did, execute same for and on behalf of the Foundation. She had the power to, and did, employ a Medical Director, who alone could furnish the medical services con-

tracted for under the certificate. The Medical Director so appointed and acting was Dr. Eugene Carbaugh, hereafter referred to as Dr. Eugene.

The Medical Director was authorized to, and did, employ other physicians as his assistants, to assist him; and he had the power to designate all "physicians, surgeons, dentists and hospitals," to render the medical services mentioned. Dr. J. Earle Donaldson and Dr. Glenn C. Carbaugh, hereafter referred to as Dr. Glenn, and Dr. Donaldson, were duly appointed and acting assistants to the Medical Director. The Foundation's office, with M. K. Kelly in charge thereof, was the same office as that of Dr. Eugene, Dr. Glenn, and Dr. Donaldson. The telephone numbers of said doctors, of said Foundation, and of the trustee, M. K. Kelly, were identical. When a private patient called one of said doctors he called that number; and when a member of the Foundation called the trustee, or any of said doctors, he called that number. Said doctors were paid by the Foundation. The established custom, in dealing with the request of members for medical attention, was for the member to call the Foundation, and request the services of one of the doctors on the staff; or Miss Kelly would assign one of them to the member.

On January 8, 1938, plaintiff went to the offices of the Foundation and requested the services of Dr. Glenn, who physically examined her. She complained of general lassitude and soreness in the wrists. Dr. Glenn examined her wrists and throat. He found the throat irritated, although same was not then sore, treated it, advised her to gargle, and told her that she should have her tonsils out within a few weeks. He prescribed medicine for her to take. She went home and to bed. She followed his instructions. Her condition of soreness of muscles in the wrists grew in intensity and spread to her arms and shoulders, thence through her body, down her legs and into her feet. She was running a temperature and was drowsy and "dopey." Her hands and fingers, as well as her limbs, swelled conspicuously. Her pain increased until she was almost hysterical at times. She was unable to get to the bathroom unaided. Her color became grayish and her fingers were so swollen as to "distend."

The above was her condition on January 12, when Dr. Glenn was called and he came out. He told her that she would just have to wear it out, and to continue taking the same medicine he had prescribed. From that time on until about the 19th her condition grew progressively worse. The Foundation, or one of the doctors, was called a time or two by plaintiff's husband and mother, and they insisted that plaintiff was not improving but was growing worse; and they requested that something more be done. No doctor came but they were told to come down and get more of the medicine prescribed by Dr. Glenn.

On the 19th or 20th plaintiff's relatives requested a visit by Dr.

Glenn but Dr. Donaldson came instead. He did not touch plaintiff but merely asked how she felt. She told him she felt worse. He stood at the foot of the bed and never examined her. The swelling was then pronounced and black spots had appeared on plaintiff's body, limbs and hands. Her throat was swollen and very sore. He prescribed a different medicine for her and left. She then could not bear the weight of bed clothes and lay between two pillows with the sheet over the pillows. He made no report of his call, or of the results thereof, to the Foundation. Indeed, no record of calls, or of examinations, symptoms found, treatment given, or anything else, was ever produced by any of the defendants in this case. It was not even claimed that any such records were kept, although it was claimed by defendants that such records were customarily kept by them.

On January 22, Dr. Eugene came to see plaintiff and made an examination of her. He came as a result of a call made the night before by plaintiff's husband who told him of her condition in detail. He made an examination of plaintiff and told her to continue the same treatment, that she would have to wear it off.

Her condition grew progressively worse until the 29th when she was unable to feed herself. Her arms and legs were immobile except when moved by some other person. Her pain was such that she cried. It took her fifteen minutes to be taken a few feet to the bathroom. The black blotches had increased in number and size. Her limbs and arms were swollen greatly. She could eat but little. She was in a drowsy semi-coma almost all of the time. In the meantime none of defendant's doctors had called nor had plaintiff been advised at any time by any of them that they would not call, nor that they had quit the case. Neither had the Foundation called or sent any other doctor, or offered so to do.

At this time plaintiff's husband requested Dr. Laurenzana to take over the case as a private physician. He came on the 29th, stripped plaintiff's clothes and gave her a methodical examination from head to foot. She was running a temperature, had extreme muscular soreness, and was in a semi-coma. He caused a blood count to be made and took a throat smear for microscopical examination. His diagnosis was that she was suffering from hemolytic streptococcus caused by a throat infection; that the germs were in the blood stream and were destroying the red corpuscles; and that her tissues were watery, making her much heavier than normal. He prescribed a compound of sulfanilamide and also ordered light ray treatments. Within about five days she responded to the treatment and eventually virtually recovered, although, at time of trial, May, 1939, he was still treating her.

Dr. Laurenzana testified that the disease of hemolytic streptococcus infection could certainly have been discovered, upon proper examination, as early as the 18th or 19th; and that it should have been an-

ticipated and suspected, from symptoms present at that time, as early as the 8th day of January. He also stated that if her true condition had been discovered at the outset, or at the earliest discoverable date, and if proper treatment of sulfanilamide had been administered that she would never have gotten into the serious condition that he found her in on January 29; and that her complete recovery would have occurred long before it did. He also stated that a patient with the symptoms that plaintiff exhibited should have been under daily observation from an early stage so that proper diagnosis might have been reached early and proper treatment thus have been given.

Defendants contend that no case was made for the jury, first because there was no expert testimony and that same in this case was indispensable. We think the testimony of Dr. Laurenzana may be considered as that of an expert, even though the term "expert" was not used in connection with his testimony. He was a qualified medical doctor, and his successful handling of the case speaks for itself so far as his knowledge in the field under investigation is concerned. He testified as above stated, and while more such testimony might well have been offered, yet his was sufficient.

In that connection we may add that plaintiff, her husband, her mother, a hired woman-servant, and a lady friend of plaintiff gave evidence concerning the general physical condition and symptoms of plaintiff, which they observed and which, therefore, defendant physicians could have seen had they examined properly. It was the duty of defendants to inform themselves of plaintiff's condition, which the evidence shows they could have done; and which evidence shows they most certainly did not do, nor make any real effort to do. For instance, if they had looked they could have seen the swelling; if Dr. Glenn had made a blood count or a laboratory test of a throat sample, or had followed the case through, as it was his duty to do (Cazzell v. Schofield, 319 Mo. 1169, 8 S. W. (2d) 580, 587), he would unquestionably have learned that the woman did not have a common cold but had a dangerous infection of the blood stream. He admitted that had he known she was getting worse he would have seen her daily. It was his own negligence that prevented him from learning what was obvious to every lay witness who saw her; and such knowledge was, time and again imparted to representatives of the Foundation. In a case of this kind, negligence can be proved by non-expert witnesses. [Reed v. Laughlin, 58 S. W. (2d) 440, 442, 443, 332 Mo. 424; Daly v. Lininger, 288 Pac. 633, 638; Buskirk v. Bucklew (W. Va.), 176 S. E. 603.] We have considered Pedigo v. Roseberry, 340 Mo. 724, 102 S. W. (2d) 600, and believe that in the instant case the outward signs of disease were sufficient to inform any one who looked that plaintiff was not suffering from rheumatism and sore throat resulting from a common cold, as Dr. Glenn had thought on the 8th, and for which defendants treated her throughout. Any layman

should know that a common cold does not cause swelling, such muscle soreness as to prohibit the weight of sheets, immobility, and large black blotches on the arms, legs and body. [Rowe v. Missouri Nat. Life Ins. Co., 96 S. W. (2d) 889, 895.] But in the Pedigo case the injuries were internal and not visible, and the cause of the injuries was in dispute, plaintiff's only evidence being that he did not know the cause. Here the qualification or skill of the physicians is not questioned. They are charged with negligently failing to take any steps to inform themselves of the nature of the ailment; or lack of attention from day to day; of failure to follow through a case once taken; and of total abandonment of a patient at a time when she was critically ill. We think the distinction between the facts in the Pedigo case and the case at bar is quite clear.

It is next urged that no submissible case was made because there was no evidence of causal connection between the alleged negligence and the alleged injury. The infection was progressive. She grew worse from day to day from the 8th until the 22nd. Lay witnesses noted this fact; and what they saw defendants could have seen and it was their duty to look. If they had not failed in their duty to observe the case as a physician's duty requires him to do, they would have known they had not properly diagnosed it, and that they had not given proper treatment. All agreed that the treatment which Dr. Laurezana gave was proper for the diagnosed ailment of hemolytic streptococcic infection; and she responded favorably to such treatment within five days after he began the treatment. We think it clear that she was injured by the neglect of duty of defendant's physicians to exercise reasonable care for the welfare of their patient. Such neglect caused her to suffer more severely, and retarded her eventual recovery. That is the inference to be drawn from the testimony of Dr. Laurenzana, and from other evidence in the case. Negligence may be shown by fair inference. [Setzer v. Ulrich, 90 S. W. (2d) 154, 156; State ex rel. City of St. Charles v. Haid, 325 Mo. 107, 28 S. W. (2d) 97, 102.] Such continued suffering and slow recovery surely entitles her to receive damages, if same was due to the negligence of defendants. Under this record we think they were shown to be negligent, and the jury so found. Such rule applies in this kind of case, especially where lack of skill is not the basis of the action, and where negligent failure to observe and discover plaintiff's condition and give proper treatment therefor, is relied on. [Reed v. Laughlin, 332 Mo. 424, 58 S. W. (2d) 440, 443, *supra*.] Failure to make a correct diagnosis, alone is not the gist of this action. Gunter v. Whitener, 75 S. W. (2d) 588, cited by defendants, is not applicable on this point.

It is contended that defendant physicians exercised their independent judgment, hence one is not liable for the errors of the others. Ordinarily that proposition is true. [Gross v. Robinson, 218 S. W.

924, 925.] But here they were acting concurrently and all were employed by the same agency for a joint purpose, namely to look after and treat plaintiff. They were associated in the same office, the office of their joint employer; and they each had knowledge of what the other had done and was doing. The facts in evidence show that they were acting jointly in a common enterprise and for a common employer; and that Dr. Eugene was Medical Director and Drs. Glenn and Donaldson were his assistants.

It is urged that the Foundation is not liable. It was properly in court and pleaded to the merits of the petition. There can be no question as to jurisdiction over it. [Clark v. Grand Lodge, 328 Mo. 1084, 43 S. W. (2d) 404, 405.] Having held itself out as capable of contracting to furnish medical services, and, in fact, having contracted in its own name to do so, it cannot be heard to say that it is not a legal entity and cannot be sued. [Clark v. Grand Lodge, *supra*, 413.] We see no conflict as between the ruling of the Supreme Court in the above-mentioned case, and that which it laid down in Peoples Finance Corporation v. Buckner, 126 S. W. (2d) 301, relied on by defendants. In the latter case it was held that Buckner had proved the terms of his contract with plaintiff; and that other evidence in the case showed that Buckner abrogated the contract and had violated and abandoned same. The evidence in the case at bar amply justified the jury in believing that plaintiff relied on the contract until she became in a dangerous condition, whereas defendants, from the first, failed to perform same in a proper manner, and that they eventually abandoned her completely at a time when she was in a critical condition and was growing worse.

In Phillips v. Railroad, 211 Mo. 419, where a railroad corporation supervised the organization of a separate hospital corporation for the purpose of furnishing medical attention to the employees of said Railroad Company, said company's officials having supervised the actual operation of said hospital association or corporation, the Supreme Court held that said Railroad Company was liable for the negligent acts of its hospital agency and of its chief surgeon and other medical employees in permitting deceased to leave the hospital and go home unattended when deceased was insane and defenant's medical authorities knew of his condition. It was further held that his death was an event which might reasonably have been anticipated as following the negligence of defendant's agents. This ruling is applied in clear language in Smith v. Chemical Works, 212 Mo. App. 158, 171.

Hence, we rule that the negligence of the chief Medical Director of the Foundation, and of his assistants, even though they were physicians, is chargeable to the Foundation; and that said Foundation is liable therefor. We also hold that neglect and inattention to plaintiff and failure to make a proper diagnosis, nor any real effort to make

one, as well as failure of defendant doctors to follow through on the case, considering plaintiff's serious condition and that she was growing progressively worse, would probably result in damage to her and that defendants and each of them must, in law, have so anticipated. Therefore, they are liable for whatever damages she suffered as a result of such negligence.

As to liability of M. K. Kelly, trustee of the Foundation, we interpret the pleadings to indicate that she was sued merely as an official of said Foundation and in her representative capacity. We think that such was the theory under which the case was submitted to the jury under plaintiff's main instruction. Her name nowhere appears in the instruction as a defendant, although the names of all physicians mentioned, as well as that of the Foundation, do appear. Therefore we think the verdict and judgment could only affect her in her representative capacity and that such judgment could not be against her, personally. The judgment, therefore, would not be enforceable as against her private property but only as against the assets of the Foundation. Therefore the judgment is effective only as against the Foundation, Dr. Eugene, Dr. Glenn and Dr. Donaldson, personally, jointly and severally.

As to the liability of Dr. Glenn, he was negligent in not following through on plaintiff's case, in having neglected her case, and in having completely abandoned same after he had assumed to be plaintiff's physician. [Boyd v. Andrae, 44 S. W. (2d) 891, 893.] Had he performed his duty as a physician (Cazzell v. Schofield, *supra*), he would have discovered plaintiff's true condition, which was serious and could, with reasonable skill, have learned the ailment from which she suffered, at least by the 15th of January, according to the testimony of Dr. Laurenzana. [Snyder v. St. Louis Southwestern Ry. Co., 72 S. W. (2d) 504, 513; Reed v. Laughlin, 332 Mo. 424, 58 S. W. (2d) 440, 443, *supra*.] For his failure so to do he is liable. This case was not tried or submitted on the theory that defendants made a wrong diagnosis or gave wrong treatment because of lack of skill. Liability is predicated on their negligent failure to apply the skill they possessed, for which negligence they are liable. [Gunter v. Whitener, 75 S. W. (2d) 588, 590, *supra*; Coffey v. Tiffany & Howard, 192 Mo. App. 455; 48 C. J. 1128, par. 114.]

As to Dr. Donaldson, while he visited plaintiff at the request of Dr. Glenn, nevertheless he thereby became the physician of plaintiff and was bound by the law governing the duties and liabilities of a physician. The disease from which she was suffering was then discoverable by a competent physician, such as he was, according to the evidence. He owed her the duty to attempt to diagnose her illness and inform himself of her true condition; and he cannot lean on Dr. Glenn and offer his negligence in failure to diagnose or treat as a legal excuse for the negligence of himself. According to all of

the testimony in the case on this point, excepting that of himself, he stood at the foot of the bed and never made any examination of plaintiff whatever. He was negligent in that he failed to make any effort to diagnose her case on his own account, or to bring to her the skill he possessed; and especially is that true in view of the fact that he could then see, as did lay witnesses, that plaintiff's hands and fingers were swollen and distended; that her hand had a black blotch on it; and plaintiff told him she was worse. A physician is liable if he negligently adopts as his own the erroneous diagnosis and treatment of another doctor, if he has opportunity to discover the true facts for himself and fails to do so, because each physician, even acting with others, is obliged to give his patient the full benefit of his own knowledge and skill. Dr. Donaldson is liable because of his own negligence in the particulars above mentioned. He made no examination whatever. It is admitted that he was not wanting in skill, but he negligently failed to apply same; and he abandoned the case without notice, and did not even report his visit or treatment to his associates, although he prescribed a "stronger" medicine for plaintiff.

Dr. Eugene, according to substantial evidence which we are required to believe true after verdict (Reed v. Laughlin, 332 Mo. 424, *supra*), visited plaintiff on January 22 and made an examination. But he did not strip her clothes, make any laboratory test, or change treatment in any way. The inference to be drawn from the evidence is that he, too, adopted the diagnosis and treatment previously adopted by the other doctors, although at the time he saw her any kind of proper examination would have disclosed the black blotches, which all physicians who testified stated were strongly symptomatic of streptococcic infection. Indeed, said spots were appearing on her uncovered hands, and the swollen, distended condition of her hands was pronounced. He had been called by plaintiff's husband, had been informed of plaintiff's condition, the history of the case, and that she was growing worse. The jury did not believe that a competent physician, as all parties agree Dr. Eugene to be, could have been justified in treating plaintiff on the theory that she had a common cold attended by mild sore throat and rheumatism, a common combination, if he had applied, or attempted to apply his skill. Dr Eugene was negligent in adopting a wrong diagnosis made by another physician, and in abandoning the case in view of plaintiff's then alarming condition, of which he had visual knowledge in addition to what plaintiff and her husband had told him. He owed her the duty, in common with his associates, to continue in the case until dismissed, or until he notified them of his withdrawal. [Cazzell v. Schofield, *supra*; 21 R. C. L. 389, par. 34; Lewis v. McClellan, 1 S. W. (2d) 247, l. c. 249.] His action in this case was negligent, especially in view of her apparent serious condition.

We think that defendant's contention that the physicians here sued

cannot be held, as a matter of law, because the rule of *respondeat superior* does not apply to physicians and surgeons, must be ruled against defendants. All of said defendant physicians were acting for one common employer, and were acting concurrently. Dr. Glenn first diagnosed and treated plaintiff. Then Dr. Donaldson did not come at the request of, or with the consent of plaintiff, but came at the request of Dr. Glenn. He accepted Dr. Glenn's diagnosis and method of treatment and did not pretend to make an independent diagnosis. Dr. Eugene did the same, although specially called by plaintiff's agent; but he was called as the employee of defendant Foundation and it was his duty to bring his best and independent skill to the relief of plaintiff, which he did not do. The negligence of the physicians was concurrent; yet each owed a separate independent duty which each failed to perform. [Gross v. Robinson, 203 Mo. App. 118.] In other words, they were jointly and severally liable for any negligence which caused plaintiff's damage, if plaintiff's evidence was believed by the jury; and it was a jury question. [Noren v. American School of Osteopathy, 298 S. W. 1061, 1064, par. 4.]

It is contended that plaintiff's main instruction, No. 1, is erroneous. A large number of reasons are assigned in support of such contention, the first being that it is too long. An instruction may not bring about a reversal of the case merely because of its length alone. [Rowe v. Missouri-Kansas-Texas Ry. Co., 339 Mo. 1145, 100 S. W. (2d) 480, l. c. 487.]

The length of this opinion, in a measure, is evidence of the involved situations presented in the record and by the evidence. Defendants, as well as plaintiff, experienced some difficulty in intelligently condensing and shortening their statements and yet discuss all points involved. Plaintiff criticises the length of defendants' statement, some twenty-five pages, although defendants, no doubt were mindful of our rule that statements must be "concise." We think the instruction not too long, considering the facts to be covered therein.

We do not find it to be redundant. The very fact that four parties were defendants, and there were, consequently, four separate sets of facts covering the four defendants' actions, that must be covered in the instruction, and that several assignments of negligence were submitted in the conjunctive, does not indicate that the instruction is redundant, or that it should be condemned for its "very immensity."

We find no findings of fact submitted therein upon which there was a lack of proof. Our previous discussion of the two points involved, and of the evidence, we think, renders it unnecessary to repeat here, in detail, what we have heretofore said in this connection.

We think it is not open to the criticism that it gives the jury a roving commission to set up its own standards of the medical profession. The theory upon which the case was tried and submitted, discloses that the instruction fairly submitted the case from the

standpoint of plaintiff. The theory of plaintiff was that although defendant physicians were fully qualified from a standpoint of skill, they were negligent in failing to apply their skill in plaintiff's illness.

It does not require the finding of any fact disproved by plaintiff's evidence. The view of defendants that the instruction does require the finding of such facts is due, no doubt, to the fact that they do not concede that certain facts were proved; and they contend that certain other facts, detrimental to plaintiff's case were proved by her. We do not agree with defendants' contention in these respects.

We agree to the elementary proposition of law, stated by defendants, that an instruction which assumes material controverted facts is erroneous. But we do not agree that such facts are assumed in this instruction. We think the fair construction to be placed on the language used in the instruction, under decisions heretofore rendered by this and other courts of Missouri, requires us to hold that no material controverted fact is assumed but that the jury is required to find such facts as are alleged before finding for plaintiff. We have heretofore held that elements of damage were proved; and we hold that the instruction did not require a finding for plaintiff without requiring a finding of facts establishing elements of damage. [Cunningham v. Doe Run Lead Company (Mo.), 26 S. W. (2d) 957, l. c. 960.]

We do not think the instruction improperly joins an action for tort and one on contract. This is a malpractice case and, therefore, subject to the rule regarding such cases. [Barnhoff v. Aldridge, 327 Mo. 767, 38 S. W. (2d) 1029, 1030, 1031; Braun v. Riel, 40 S. W. (2d) 621, l. c. 622, 623.]

It is not broader than the pleadings or the proof.

It does not set up two different medical standards for measurement of the skill of the physicians. Nowhere in the evidence or pleadings is the skill of defendant physicians challenged, but it is claimed that they were negligent in that they failed to exercise their skill by negligently failing to properly observe the progress of plaintiff's condition, or to advise themselves of her conditions, etc., in short, that they were negligent as physicians, regardless of their skill or ability.

The point that they lacked skill was not in issue and consequently any mention thereof is immaterial. [Tureen v. Peoples Motorbus Co., 97 S. W. (2d) 847, l. c. 848.] All assignments of negligence that were submitted, were submitted in the conjunctive, hence all findings necessary to support one such assignment of negligence was also required to support the others. The jury could have found that, while defendants were skillful physicians, that they were negligent in applying their skill. Therefore defendants could not be harmed by the instruction in any event. [Robinson v. O'Shanzky, 96 S. W. (2d) 895, 900; Tureen v. Motorbus Company, supra.]

Complaint is made that the instruction groups all defendants to-

gether and precludes a finding of liability as to one without finding liability on the part of the others. The case was tried on the theory of concurrent negligence of all. However, the court gave Instruction K which required a verdict for any one or more of said defendants if the jury failed to find, by a preponderance of the evidence, that any one or more of them was guilty of the negligent acts charged. The court also, by instruction in the nature of form of verdict, provided for an acquittal of any one or more of said defendants, or all of them, and for a verdict for plaintiff against any one or more of said defendants, or all. We think the point should be ruled against defendants.

Plaintiff's Instruction 2 is merely explanatory of Instruction 1. Any reference therein to the degree of care required of said physicians as being that degree exercised by physicians of ordinary care and prudence practicing that profession in Kansas City, was harmless. No charge was made at any time or place in the entire record, as to the lack of skill of said physicians as compared with the skill of other physicians in Kansas City.

Instruction No. L, requested by defendants, was properly refused. It would have been error, under the law and the evidence in the case, to have told the jury, as such instruction would have done, that defendants were not guilty of negligence in failing to respond to calls made by plaintiff for her treatment. It was their duty to respond. [Citations *supra*.]

Error is charged because the court refused to declare a mistrial when counsel for plaintiff stated in argument that defendants had "put her down . . ." The objection was made before the sentence was completed, as the record shows, and we don't know what could have been the termination of context of same if it had been completed. The statement complained of is incomplete and we can't say that the court erred in overruling defendants' objection and in refusing to grant a mistrial. In the discussion brought about by the objection the sentence was abandoned and was never completed. Under the circumstances here, where the court stated, at the time that both sides had said things not supported by the evidence, we cannot say that the incomplete sentence was not an answer to some argument previously made by counsel for defendants.

A mistrial was also urged because plaintiff's counsel argued that "abandonment" of plaintiff was sufficient to justify a judgment for her, although that, with other alleged negligent acts, were stated in the conjunctive in her main instruction, as grounds for a verdict. The whole argument is not before us. We are unable to determine how one could argue such a case as this without taking the various alleged negligent acts up, one by one, and discuss same. The court was there and observed and heard the entire argument and we are inclined to defer to his ruling on the matter.

There is no complaint that the verdict and judgment in the amount of $3000, is excessive. We have ruled all of the points urged and, finding no error, the judgment is affirmed. *Campbell, C.,* concurs.

PER CURIAM:—The foregoing opinion of SPERRY, C., is adopted as the opinion of the court. The judgment is affirmed. *Shain, P. J.,* and *Bland, J.,* concur; *Cave, J.,* not sitting.