John W. SALL, Jr., and Karen Sall, Appellants,

v.

Dr. Howard J. ELLFELDT and Dr. T.R. Hunt and Research Medical Center, Respondents.

No. WD 33480.

Missouri Court of Appeals, Western District.

Sept. 13, 1983.

Edward M. Boyle, Olathe, Kan., A. Howard Chamberlin, Elwood L. Thomas, Shook, Hardy & Bacon, Kansas City, for appellants.

William H. Woodson, William C. Martucci, Kansas City, for Hunt.

Thomas Wagstaff, Kansas City, for Ellfeldt.

W. James Foland, Kansas City, for Research Medical Center.

Before TURNAGE, P.J., and SHANGLER and CLARK, JJ.

SHANGLER, Judge.

The plaintiffs Sall, husband and wife, sued for personal injury to the husband and loss of consortium to the wife from the medical negligence of defendant physicians Ellfeldt, Hunt and Pryor, and Research Medical Center where the husband was a patient at the time of the alleged malpractice. The claim against Dr. Pryor was dismissed on pretrial motion, and prior to trial the plaintiffs settled their claims against Dr. Ellfeldt and the Research Medical Center for $230,000. There remained for trial the petition against the defendant Hunt and the crossclaims of physician Ellfeldt against Hunt and Research Hospital, and the crossclaim of physician Hunt against Ellfeldt.

At the close of the evidence, the Ellfeldt crossclaim against Research Medical Center was dismissed. Thus, the only claims submitted to the jury were those of the plaintiffs Sall, husband and wife, against the physician Hunt, and the crossclaims of Ellfeldt and Hunt against each other. The jury returned a verdict for the defendant Hunt on the Sall claims for medical malpractice, thus, the jury did not reach the crossclaims for contribution between the physicians Ellfeldt and Hunt.

The plaintiffs Sall contend that the converse instructions submitted by the defendant Hunt were erroneous. The defendant Hunt contends that there was no substantial evidence of a causal connection between any professional negligence by the defendant Hunt and a resultant damage to the plaintiffs, so that the cause of action was not submissible—and any error in instructions was made harmless. To recover, the plaintiffs submitted the alternative theories that neurosurgeon Hunt failed to diagnose the cauda equina syndrome, or that the physician should have known Sall had cauda equina nerve pressure but failed to inform the patient of the necessary treatment, or of the consequences should the treatment not be taken immediately. In more exact terms, the defendant contends that the expert testimony that the damage to Sall was *probably* caused by the neglect to diagnose the cauda equina snydrome and to inform plaintiff Sall of the necessary treatment for the condition does not rest on a requisite degree of conviction—a *reasonable medical certainty*—so does not prove the issue of causation or, hence, a submissible cause of action.

Sall suffered a back injury at work on December 6, 1975. He saw Dr. Harris, an associate of Dr. Ellfeldt in the practice of orthopedic surgery, on December 11, 1975. Sall complained of back pain. Harris examined and tested him, diagnosed the condition as a lower back sprain, recommended bed rest, prescribed medications, and instructed him to return if the pain continued. The pain persisted and he returned to the Ellfeldt office on Wednesday, December 17, 1975. Dr. Ellfeldt examined Sall and concluded that the patient "probably had an acute herniated nucleus pulposus or a ruptured disc of [sic] his lower back." Dr. Ellfeldt recommended that Sall enter the hospital, and that evening he was admitted to Research Medical Center. In addition to the standard tests upon admission, Dr. Ellfeldt ordered that an electromyogram [EMG] be performed on Sall. The test was administered by Dr. Pryor the next morn-

ing. In the course of the EMG procedure, Sall suddenly lost sensation in his legs, and by the time he left the test room his legs were completely numb. That evening, Thursday, Sall complained to his wife that he had no feeling from the waist down. The results of the EMG as reported by Dr. Pryor on the Sall hospital chart that Thursday indicated some bilateral nerve irritation at the L4–L5 level and confirmed the diagnosis of nerve root pressure probably due to a herniation at that site.

Ellfeldt saw Sall in the hospital on Thursday morning—whether before or after the EMG test was administered, he could not say. The condition of the patient had not changed since the day before. That night, the notes kept by the nurses show Sall complained of severe pain in the left hip. He was injected with morphine, and Dr. Ellfeldt was consulted by telephone. Sall became extremely restless during the night, he was medicated again and placed in a jacket for restraint. The nurse returned at about 4:45 a.m. to administer a sedative and found the restraints severed and a methanex bottle nearby, empty. Sall informed the nurse he had consumed the contents. Dr. Ellfeldt was called, he did not come at that time, but ordered the insertion of a catheter, since he could not void. The discovery of the methanex bottle confirmed the earlier suspicions entertained by Dr. Ellfeldt that Sall was over-sedated from access to other medicines. The physician considered that Sall was in the throes of drug intoxication or withdrawal, and that his presence was not then required. The next morning a nurse from the Kansas University methadone program brought a supply of the drug, and it was thereafter supplied to the patient systematically.

That morning, Friday, December 19, 1975, Dr. Ellfeldt reviewed the EMG report and examined Sall. The patient complained of numbness in both legs, primarily from the navel down. He complained also of incontinence. The doctor noted the EMG suggestion of bilateral L5 root involvement, but was confused by the complaint of numbness from the navel and inability to move—the doctor "was worried about something lower down." Dr. Ellfeldt considered these to be a hysterical manifestation, a nontrue numbness. Combined with methadone, the doctor "literally was confused" by the symptoms. As he explained:

"I really thought our major problem was a drug withdrawal or an overdose of some type, and—mainly because of the distribution of his complaints. They just didn't follow cauda equina syndrome.[1] So I could not make that diagnosis at that state in time, and I did not make that diagnosis."

Dr. Ellfeldt concluded to consult with a psychiatrist—to assess the effect on the patient of the interaction between the methadone and the other narcotics administered in the course of hospital treatment—and also with a neurosurgeon—to assess the disc involvement in view of the inability of the patient to void.

The Sall hospital chart noted that at 1:00 p.m. that Friday Dr. Ellfeldt ordered a consultation by neurologist Dr. Hunt ["Dr. Hunt to see"], but the notation conveyed no urgency.[2] When such a direction intends a sense of emergency, an orthopedic surgeon will note that an immediate consultation is wanted—or will call the consultant personally. Dr. Hunt was notified at home on Friday evening, December 19th, by a hospi-

1. *Cauda equina*—literally means "horse's tail" and aptly describes the physiology: "the roots of the upper sacral nerves which are of great length because the spinal cord does not extend beyond the first lumbar vertebra and which form a bundle of filaments within the spinal canal." Webster's Third International Dictionary (Unabridged, 1971). The *cauda equina syndrome* is defined as "pain, combined variously with sphincteric disturbance and an asymmetric, atrophic, araflexic paralysis and sensory loss in the distribution of the lumbosacral

roots; due to a compression of the cauda equina." Gould's Medical Dictionary, 4th ed. (1979).

2. Dr. Ellfeldt consulted with Dr. Hunt on frequent occasions. He did not perform laminectomies, but referred them back to Dr. Hunt if required. Thus, Dr. Hunt was called in when the back or neck pain symptom suggested laminectomy as the indicated treatment.

tal staff nurse that Dr. Ellfeldt has requested consultation concerning Sall. In response to inquiry, the nurse informed Dr. Hunt that Sall had a "probable ruptured disc." Dr. Hunt visited Sall the next morning, Saturday, December 20th, and after a review of the charts and a view of the patient Dr. Hunt knew Sall had a "severe problem." The doctor was concerned about the inability of the patient to voluntarily void. He concluded from the straight leg-raising tests that Sall probably had a "large ruptured disc," and from other tests that there was injury or pressure to the nerves on both sides of the body from L4 down through S5. Dr. Hunt diagnosed the condition as "a rupture of the lumbar disc at the L4–L5 level, centrally or medially into the cauda equina." These symptoms, combined with the paralysis of the feet, a numbness pervasive over the legs, thighs and genital area, prompted Dr. Hunt to the diagnosis: "I feel it was very obvious. I think practically any neurosurgeon could recognize it."

Dr. Hunt discussed the diagnosis with both Sall and his wife present during the examination. He told them he thought Sall had a ruptured disc "but one that was much more serious than the ordinary kind of ruptured disc." He recommended an immediate myelogram, and the probable need for surgery. The Salls became very agitated, according to Dr. Hunt, and "refused even to consider having the myelogram at that time." Dr. Hunt testified he told them that "if they put it off, there is a risk of further damage occurring, but they still refused." It was then about 9:00 a.m. on Saturday the 20th. The report Dr. Hunt composed the next day made no reference to any recommendation to the Salls or that they refused treatment on that occasion the day before. Nor did the discharge summary narrative note any such disclosure. Dr. Hunt saw Dr. Ellfeldt as he left the Salls and—by the Hunt version—that he had seen the patient, "thought he was in trouble, that he needed to have a myelogram done right away, and that I [Hunt] had told him that and that he refused it." Ellfeldt told Hunt—by that version of the events—that he would talk to the patient. Some time later, perhaps for-

ty-five minutes, Hunt saw Ellfeldt again in the emergency room and Ellfeldt reported: "Well, he still refuses," but nevertheless scheduled a myelogram for Monday "in case he changed his mind." It was the testimony of Dr. Ellfeldt, however, that he recalled no mention by Dr. Hunt that Sall refused the myelogram and surgery at any time after that examination on Saturday morning. It was the separate testimony of the Salls, husband and wife, that Dr. Hunt did not inform either of them about the condition of the husband or the need for surgery. That testimony was corroborated by the Sall brother and mother. There was a notation entered on the Sall chart by a nurse on 10:30 a.m. on Saturday, December 20, 1975, however, which recited: "Patient [Sall] upset and crying. States he has to have surgery." There was also evidence that Sall on *Saturday* signed a permit for the myelogram procedure to be administered on the following Monday.

Dr. Ellfeldt left for California that Saturday. He was the team physician for the Kansas City Chiefs, then scheduled to play the Oakland team. He did not see the patient again until Monday, December 22nd. On Sunday, December 21st, Hunt reviewed the Sall chart and talked to the staff about his condition, but did not pay Sall a visit. Dr. Hunt testified he assumed that Dr. Harris [associated with Ellfeldt] would see the patient that Sunday and that if any change in condition occurred, or if Sall decided to proceed with the myelogram, Dr. Harris would call him.

Dr. Ellfeldt returned from the California trip and on Monday, December 22nd, performed a myelogram on Sall. After a review of the test results, Dr. Hunt told Dr. Ellfeldt that a "block" was evident from the myelogram, and "there was no alternative but to go ahead and operate on him if [Sall] was agreeable." Dr. Ellfeldt agreed surgery was necessary. Dr. Hunt visited the Salls that morning, informed them that he had seen the myelogram result and had consulted with Dr. Ellfeldt. He conveyed that the doctors "felt that the myelogram showed a complete blockage and that . . .

there was no alternative but to operate to relieve this blockage if there was any hope for any improvement; that without the surgery, there was no hope of improvement." Dr. Hunt then also informed the Salls that "there was no guarantee whatsoever that he would get well, that he would be cured or that he would be as good as new."

On Tuesday morning, December 23rd, Dr. Hunt performed a partial hemilaminectomy bilaterally. Dr. Hunt explained: "The disc mass [removed] was enormous . . . [but] [t]he operation was very easy. There was nothing difficult or unusual about it all, except for the tremendous size of this ruptured disc. But the actual removal of it was extremely easy."

Sall was released from the hospital on January 5, 1976. Sall continues to experience numerous infirmities. He walks with the support of a cane, senses weakness in the lower extremities, and has some paralysis in the feet. Sexual function is possible but impaired. He lacks bladder and bowel control.

The plaintiffs do not contend that the surgery was less than a professional performance. They contend, rather, that there was a negligent delay in the diagnosis of the condition as cauda equinus, and hence the necessary treatment was not timely recommended or performed, so that the residual physical condition was worse than would have eventuated from a timely diagnosis and treatment. That claim was asserted against all three medical care providers— the physicians Hunt and Ellfeldt and the Research Medical Center. The claims against Ellfeldt and the hospital, as we note, were settled, so that only Dr. Hunt remained as a malpractice defendant. The submissions to the jury, nevertheless, directed a recovery for the Salls on findings that Dr. Hunt neglected to diagnose the cauda equinus nerve pressure or to inform the patient of the necessary treatment or of the consequences should the treatment not be undertaken immediately—and that the negligence of that actor, or combined with acts of Dr. Ellfeldt, directly caused damage

to Sall for which he was not fully compensated.

The defendant does not contend the evidence does not allow the issue that each of the physicians, Hunt and Ellfeldt, neglected to diagnose the cauda equinus condition or that each neglected to order an immediate myelogram and arrange for the contingency of an immediate surgery which—if found by the jury—was professional conduct substandard and negligent, but argues that the plaintiff failed to prove causation between the malpractice and the injury—indispensible to the proof of the cause of action. The exact contention is that there was no evidence by an expert witness that an act or omission by Dr. Hunt, with *reasonable medical certainty,* caused the disability or damage to the plaintiffs Sall. We do not consider the question, however, because there was no instruction error, and the judgment must be affirmed.

We come to the contention of the appellants Sall that the converse instruction submitted by the defendant Hunt violated the prescriptions of MAI and resulted in prejudicial error and the right to a new trial.

■ The cause of action was submitted against the defendant Hunt alone. The original petition joined other defendants, Dr. Ellfeldt among them, but that claim was dismissed before the trial. That settlement would not preclude Sall from suit against Dr. Hunt as a joint tort-feasor of Dr. Ellfeldt [§ 537.060, RSMo 1978] or as an actor whose separate negligent conduct combined with that of Dr. Ellfeldt, and so was a substantial factor to bring about the harm—if the evidence proved a joint tort-feasor relationship. *Crump v. Piper,* 425 S.W.2d 924, 928[3] (Mo.1968); *Baird v. National Health Foundation,* 235 Mo.App. 594, 144 S.W.2d 850, 855[9] (1940); Restatement (Second) of Torts § 431 (1965).

The plaintiff Sall submitted this theory of recovery by Instruction No. 8.

" 'Your verdict must be for plaintiff John Sall against defendant Dr. Thomas Hunt if you believe:

First, either:

defendant Dr. Thomas Hunt failed to diagnose the cauda equina nerve pressure of plaintiff John Sall at a time when defendant Dr. Thomas Hunt by using ordinary care could have diagnosed such condition, or

at a time when defendant, Dr. Thomas Hunt knew or by using ordinary care should have known that plaintiff John Sall had cauda equina nerve pressure, defendant Dr. Thomas Hunt failed to reasonably inform plaintiff John Sall of the necessary treatment for such condition, or failed to reasonably inform plaintiff John Sall of the consequences of such treatment not being immediately undertaken, and

Second, defendant Dr. Thomas Hunt, in any one or more of the respects submitted in paragraph First, was thereby negligent, and

Third, such negligence either directly caused damage to plaintiff John Sall for which he has not been fully compensated or combined with the acts of Dr. Howard J. Ellfeldt to directly cause damage to plaintiff John Sall for which he has not been fully compensated.'

The phrase ordinary care as used in this instruction means the use of that degree of skill and learning ordinarily used under the same or similar circumstances by the members of defendant Dr. Thomas Hunt's profession."

The defendant Hunt conversed the causation component of the verdict director by Instruction No. 9:[3]

"Your verdict must be for defendant Dr. Hunt on the claims of Mr. and Mrs. Sall against him unless you believe he was negligent as submitted in Instruction Number 8, and as a direct result of such negligence, plaintiff John Sall sustained damage."

The plaintiffs Sall contend that their causes of action were premised on the joint tort-feasance of *both* Dr. Ellfeldt and Dr. Hunt and that the causation for the Sall injury was their negligence in combination *or* the negligence of Dr. Hunt alone and that they were entitled to recover damages on the proof of *either* alternative—and that is the theory of causation submitted by proposition Third of the verdict directors. They contend that the converse Instruction 9 submitted by the defendant which directs verdicts for the defendant unless the jury believe *Dr. Hunt was negligent* as submitted in the verdict director *and as a direct result of such negligence* Sall sustained damage constricts the premise [of the alternative combined negligence of Ellfeldt and Hunt *or* the singular negligence of Hunt] to the conduct of Hunt alone and so subverts the theory of recovery. The plaintiffs Sall contend that the converse instruction falls into error because it neglects the mandates of MAI for such a submission.

■ The Instruction No. 9 attempts the form of a true converse—a submission which requires no independent evidence to support it but rests rather upon the contention of the adversary that the plaintiff has failed to prove some portion of his case. The General Comment to the MAI 33.01 [1980 Revision] Converse Instructions explains: "[I]t [the true converse] is the device with which the defendant seeks to emphasize one or more of the elements of the case upon which the plaintiff has the burden of proof." It is for this reason that a true converse prefaced by: *Your verdict must be for defendant, unless you believe,* must submit the proposition of the verdict director *in substantially the same language used in the verdict director.* Otherwise, there is peril that the legitimate burden of proof may be distorted into a misdirected verdict. *Snyder v. Chicago, Rock Island & Pacific Railroad Company,* 521 S.W.2d 161, 164[4–8] (Mo.App.1973). The General Comment to

3. The plaintiff Karen Sall submitted an identical theory of recovery by Instruction No. 12, which replicates Instruction No. 8 except for the name of the plaintiff. The defendant Hunt anomalously used Instruction No. 9 to converse both Instruction No. 8 [the husband Sall cause of action] and Instruction No. 12 [the wife Sall cause of action] although, in terms, the converse refers only to the husband Sall verdict director and not at all to the wife Sall verdict director.

MAI 33.01 [1980 Revision] Converse Instructions explains further: "The defendant has the option to converse one or more elements of the verdict director. *The only limitation on defendant's right to converse as much or as little of the verdict director as desired is with respect to disjunctive submissions. If defendant elects to converse any element which is submitted by the verdict director in the disjunctive, he must converse all such disjunctive elements.*" [emphasis added]

On this appeal the plaintiffs Sall contend that converse Instruction No. 9 was prejudicially erroneous because the submission failed to conform with the MAI mandates that the proposition be in substantially the same language used in the verdict director and because the instruction failed to converse all of the disjunctive elements of the causation component of the verdict director. These contentions are single: they merge to assert that the neglect to formulate the converse according to the verdict director terminology imposed a more burdensome proof of causation than the law expects. More exactly, the plaintiff argues that to confine the Sall recovery [as does converse Instruction No. 9] to the damages occasioned as a direct result of the *Hunt* negligence—rather than to allow recovery [as does the verdict director] for the damages occasioned as a direct result of the *Hunt* negligence *or* combined with the Ellfeldt conduct is to influence the jury to return for Hunt unless his negligence was the sole cause of the injuries. And, indeed, MAI 19.01 [1981 Revision] Verdict Directing Modification—Joint Tort-Feasors cautions:

"When the verdict directing instruction directs a verdict against one of two or more joint tort-feasors, the "direct result" language of paragraph Third of verdict directing instructions such as 17.01 and 17.02 [basic negligence verdict director patterns] might be misleading."

To allay that risk, MAI 19.01 suggests the option to submit causation by: "such negligence either directly caused damage to plaintiff or combined with the [acts of joint tort-feasor] to directly cause damage to plaintiff." The plaintiff adopted that op-

tion to submit causation in proposition Third of the verdict director. The failure of the defendant to conform the converse to this formulation of causation, the plaintiffs complain, confused the jury.

■ The validity of that contention, of course, presupposes that converse Instruction No. 9 incurred confusion among the jury or misled them to the adverse verdict. A true converse, according to the precepts of MAI 33.01, must submit the proposition of the verdict director in substantially the same language of that instruction. That precaution is to avoid the distortion of the legitimate burden of proof on that issue. *Snyder v. Chicago, Rock Island & Pacific Railroad Company,* 521 S.W.2d 161[4–8] (Mo.App.1973). It may be said that Instruction No. 9 was not a technical compliance with the principle that "all of the language of the converse instruction except the preliminary phrase is to be taken from the verdict director ..." MAI 33.01 [1981] Converse Instructions—General Comment. Committee Comments, of course, are advisory not mandatory. Notes on Use must be followed, and the neglect to heed them almost certainly means reversible error. *Riley v. Bi-State Transit System,* 459 S.W.2d 753, 757[3, 4] (Mo.App.1970). A litigant owes Committee Comments careful consideration [*Peak v. W.T. Grant Company,* 409 S.W.2d 58, 60[1] (Mo. banc 1966)], but prejudice does not follow as of course from a neglect of them. *Corbin v. Wennerberg,* 459 S.W.2d 505, 511 (Mo.App.1970).

■ The question remains whether the failure of the converse to follow the terminology of the verdict director causation element so disadvantaged the plaintiff—either as a distortion of the burden of proof on that issue or by confusion—as to render the submission prejudicially erroneous. Instruction No. 9 was a response to the causation element of Instruction No. 8. A settled principle requires that the verdict director and the converse instruction be read together to determine the meaning they yield to a jury of ordinarily intelligent laymen: if the submission is legally sufficient

by that standard, there is no prejudice. *Bartleman v. Humphrey,* 441 S.W.2d 335, 348[25] (Mo.1969).

 It is the contention that Hunt and Ellfeldt were joint tort-feasors and to allow the jury, as does the converse, to find for Hunt, unless they believed that the Sall injury was a direct result of the Hunt negligence alone, misled the jury and subverted the joint tort-feasor theory of the verdict director that Sall was entitled to a verdict for injury caused either by the Hunt negligence alone *or* in combination with the Ellfeldt conduct.[4] The plaintiff argues that the converse terminology: that the verdict must be for Hunt unless he was negligent and as a *direct result of such negligence* Sall sustained damage transmogrifies the joint tort-feasor submission of the verdict director into a sole cause direction. An instruction which attributes injury to the neglect of a single actor rather than to combined conduct, of course, connotes sole cause [*Kimbrough v. Chervitz,* 353 Mo. 1154, 186 S.W.2d 461, 466[10–15] (1945); *Mitchell*

4. The plaintiff Sall argues the effect of the joint tort-feasor principle for reversal of the judgment, but does not differentiate among the multiple premises of legal responsibility that concept encompasses.

The term *joint tort-feasor* describes four distinct species of conduct for which the law holds the wrongdoers jointly, severally, or entirely liable for the resultant harm. [1 F. Harper and F. James, The Law of Torts § 10.1 (1956)]:

Cases in which there is a *concert of action* or a common plan are the clearest examples of joint torts. In addition, when two or more *parties who are under a common duty to* another fail in performance, a joint tort has occurred ... [E]xamples of *vicarious liability* are also instances of joint torts ... Other situations occur in which there is neither a concert of action nor a breach of common duty, but *where a single indivisible harm is sustained as a result of the independent, separate, but concurring tortious acts of two or more persons.*

....

Thus it is seen that substantive law exhibits four categories in which the courts have imposed joint and several liability. Two of these are more truly joint torts within the original meaning of the term, the third is in reality grounded in the principles of the law of agency, and the last is included because it results in indivisible harm for which judicial policy has imposed entire liability. [emphasis added]

The relationship between Dr. Ellfeldt and Dr. Hunt was that of one physician who refers a patient to another for examination, consultation and rendition of services. The mere referral of a patient by one physician to another competent physician does not by that fact impose liability on the physician who refers for the negligence of the other. *Mincey v. Blando,* 655 S.W.2d 609 (Mo.App.1983); D. Harney, Medical Malpractice § 6.2 (1973). Independent practitioners who treat a patient at the same time may become liable however, where the evidence invokes principles of joint venture or other species of joint tort-feasance. Thus, in *Crump v. Piper,* 425 S.W.2d 924 (Mo.1968),

where the physicians were jointly employed, performed joint surgery and administered joint post-operative care, each was held for the negligence of the other. So, also, in *Baird v. National Health Foundation,* 235 Mo.App. 594, 144 S.W.2d 850 (1940), three physicians who were associated with a joint employer and acted in concert to treat were held liable on principles of vicarious and joint tort-feasance liability.

There was no principle of agency, control or joint venture—and hence of vicarious liability—which operated between Dr. Ellfeldt and Dr. Hunt nor was there the concert of action or common duty which marks other species of joint tort-feasance. The only joint medical conduct between them was the agreement that surgery was necessary. They were independent actors. The neglect of Dr. Ellfeldt to diagnose the cauda equina and the neglect of Dr. Hunt to come to that diagnosis or to disclose to Sall the condition or necessity for prompt surgery—as the petition alleges—were independent neglects and omissions of each physician. Thus [if we assume the sufficiency of that proof—a premise the defendant Hunt disputes], the theory of joint tort-feasor liability the verdict director submits is that: where two or more persons who act independently commit consecutive acts of negligence, closely related in time, to bring about an indivisible injury—an injury the trier of fact cannot with reason be expected to apportion among the tort-feasors— each tortious actor is liable jointly and severally for all the caused harm. *Barlow v. Thornhill,* 537 S.W.2d 412, 418[1] (Mo. banc 1976); *Glick v. Ballentine Produce Incorporated,* 396 S.W.2d 609, 612[3–6] (Mo.1965); 1 F. Harper and F. James, The Law of Torts § 10 (1956). Other jurisdictions apply this general principle to medical malpractice: *Gilson v. Mitchell,* 131 Ga.App. 321, 205 S.E.2d 421 (1974), *aff'd,* 233 Ga. 453, 211 S.E.2d 744 (1975); *Incollingo v. Ewing,* 444 Pa. 299, 282 A.2d 206 (1971); *Lindquist v. Dengel,* 92 Wash.2d 257, 595 P.2d 934 (banc 1979); 61 Am.Jur.2d, Physicians & Surgeons, Etc. § 292 (1981). We assume for purpose of opinion that our own law accommodates a kindred policy.

*v. City of Springfield,* 410 S.W.2d 585, 588 (Mo.App.1966) ]—but that is merely to restate the contention that Instruction No. 9 was not a complete converse, and so erroneous. The question of prejudice remains.

▮▮▮ The converse Instruction No. 9 refers to verdict director Instruction No. 8:

"Your verdict must be for defendant Dr. Hunt on the claims of Mr. and Mrs. Sall against him *unless you believe he was negligent as submitted in Instruction No. 8,* and as a direct result of such negligence, plaintiff John Sall sustained damage." [emphasis added]

Instruction No. 8, as we note, predicates recovery on propositions that Hunt was negligent in any of the alternative particulars submitted and that his malpractice alone *or combined with the acts of Ellfeldt* caused the injury. Thus, the converse refers the jury to the theory of recovery and so, read together, informs that Sall was entitled to a verdict not only if the Hunt misconduct alone caused the injury, but also if that negligence merely combined with the Ellfeldt acts to cause the injury. The defendant Hunt argues that the synthesis of the two instructions palliates any error.

We need not join that surmise. We assume, rather, that if converse Instruction No. 9 even when read together with verdict director Instruction No. 8 remains truncated, and so faulty as a statement of the joint tort-feasor principle, the other submissions complete the interstices and so avoid any substantive error.

That the Sall recovery was on the premise of joint tort-feasor liability was a theme not only verdict director Instruction No. 8 presents, but one which recurs in the apportionment of fault packet of directions. Instruction No. 15 directs the jury to apportion fault between *Dr. Hunt and Dr. Ellfeldt* if they find Ellfeldt negligent in any alternative particular and, [causation proposition Third]:

such negligence either directly caused damage to plaintiffs, or either of them, *or combined with the acts of Dr. Hunt to directly cause damage to plaintiffs,* or either of them. [emphasis added]

Instruction No. 16 instructs that if the verdicts are in favor of each of the Sall plaintiffs and against Dr. Hunt

"*and if your findings are against Dr. Ellfeldt* under Instruction 15 then you must assess the *proportion of fault which each Dr. Hunt and Dr. Ellfeldt has for John and Karen Sall's damage* . . . ." [emphasis added]

Verdict C then provides the form for the assessment of the proportions of fault between Hunt and Ellfeldt for damages returned in favor of the Sall plaintiffs.

These formal instructions of the court restate, albeit inversely, what Instruction No. 8 submits: that the premise of the Sall recovery was joint tort-feasor negligence and entitled return of verdict for damage caused by the conduct of Hunt *or* by the combined conduct of Hunt and Ellfeldt. They dispel any intimation of sole cause, and could not otherwise distract the jury to that mistake. Instruction No. 9 was a converse instruction governed by the general Comment to MAI 33.01. There was no peremptory form to follow, thus any variance from the comments did not result in presumptive prejudice. Instruction No. 9, considered within the text of verdict director Instruction No. 8 to which it refers, and integrally with Instructions No. 15, No. 16 and Verdict C, neither distorts the burden of proof on the causation of damages nor engenders confusion on that issue. Thus, Instruction No. 9, albeit unduly terse, was not erroneous as a matter of law, caused no unfairness to the plaintiff, and did not materially affect the merits of the action. *Wims v. Bi-State Development Agency,* 484 S.W.2d 323, 326[7, 8] (Mo. banc 1972); *Executive Jet Management & Pilot Service, Inc. v. Scott,* 629 S.W.2d 598, 609[20, 21] (Mo. App.1981); *Smith v. Courter,* 575 S.W.2d 199, 206 (Mo.App.1978).

The judgment is affirmed.

All concur.